Johnston, Ch.
dissenting. The decree in this case evidently regarded the plain tiff’s bill,
(1.) As the bill of a general creditor, claiming for advances made to the Ocmulgee Bank; and seeking a decree against the Rail Road Bank, which, by fraudulent interference with the assets of the debtor, had frustrated the creditor’s remedy : — and
(2.) As the bill of a creditor, holding bills, issued by the Ocmulgee Bank, and placed in his hands, as a collateral security for his advances: — and claiming a decree against the Rail Road Bank, as a stockholder, for such portion of said bills as the charter obliges them to redeem; — so far as such decree may be necessary to the complete repayment of the sums advanced by him — after exhausting the accountability of these defendants under the first head.
The decree, upon conclusive evidence, establishes the fact, that the advances were actually and bond fide made; and that these defendants did, by their agents, fraudulently interfere with the assets of the debtor, by taking a very large portion of them to themselves, and by conniving at the delivery of other portions to parties bound for their payment; thus leaving the debtor utterly insolvent, and the plaintiff remediless. Under these circumstances, the decree held the Rail Road Bank accountable to the plaintiff, in respect to his advances, not only for the assets which they took to themselves, but also for the obligations which they assisted to cancel and deliver up to Lamar and others.
The decree also establishes, that the bills held by the *332 plaintiff were issued to him by the Ocmulgee Bank, as collateral security for the money advanced by him to them: and, ¿setting aside, as fraudulent, a transfer of their shares, by which the Rail Road Bank attempted to throw off their ,. liabilities as stockholders, to. redeem bills of the Ocmulgee Bank, holds them liable, m proportion to their stock, for the redemption of the bills in the plaintiff’s hands..'
2 Rich. Eq. X Rich. Eq. 406; and see also Regina v. Boucher, 43 Eng. Com. L. 904; and Banks v. Poi-tiaux, 3 Randolph, 136.
The decree was, at the same time, careful of the other creditors of the Ocmulgee Bank; and such an order was made as enables them to come in, with-the plaintiff, as a general creditor. But the Rail Road Bank, in respect to any demand she may have against the Ocmulgee Bank, was postponed to all other creditors, on account of the fraud established against her.
The appeal draws in question the correctness of this judgment, upon grounds, many which are strictly technical, and having little to do with the merits; and I am now to examine the force and validity of the objections thus presented, and see whether they are sufficient to set aside the décree.
The first objection is, that the plaintiff, though he be a creditor, and though he hold bills of the Ocmulgee Bank, binding both on the Bank and its Stockholders, is, nevertheless, entitled to no remedy ; because the bank was not legally constituted, by the payment in of the amount of specie, required by the charter, before proceeding to busines. Nothing that has been pointed out in the evidence has shaken my conviction that the terms of the charter were substantially and faithfully complied with. But, if it were otherwise, it is very clear, that it is not the privilege, either of the Bank or of its Stockholders, to avail themselves of the illegality of their own institution, as a ground to avoid their own contracts.
Further ; — it is not the privilege of any third party, contracting with them, to avoid his contracts, upon such a ground. We have decided, in Van Lew v. Parr, and in conformity to whát was advanced in Whitworth v. Stuckey, that the purchaser of lands, let into possession, and undisturbed in his possession, cannot avail himself of a flaw in his vendor’s title, to avoid payment of the purchase money. And upon the very same principle, but with stronger reason, defects in the charter of this Bank, which the sovereign authority by which it was granted has suffered to remain, unquestioned, in the lands of the corporators, are no ground for excusing the corporation or the corporators from, the performance of their corporate contracts.
The objection just disposed of went to the whole bill.
The next applies only to the plaintiff’s claim, as a general creditor, for advances made.
This objection is that the bill is not so framed as to set foi*th the plaintiff’s advances as a ground of relief.
Nov. 22 1842.
Nov. 23.
Prince’s Dig. 63S-
The bill expressly states the advances, and the issue of the bills of the Bank, as collateral security for the debt thus con-traded; and, moreover, that the Bail Road Bank was informed both of the indebtedness and the security taken.
It then charges, in general terms, the plan adopted by this stockholder, to rid herself of her liability to bill holders, and her interference with the assets of the Ocmulgee Bank, some of which she took to herself, and others she procured to be delivered up to the debtors; “ thus, at the same time,” says the bill, “ giving up the assets of the bank, to a very large amount, and relieving the stock from liability to creditors of the said bank.”
It is further charged, that the Rail Road Bank “induced the Board of Directors of the Ocmulgee Bank to make a selection of the best assets of the said Ocmulgee Bank, amounting, in the whole, to $137,764, — and transfer the same to the said S. W. R. R. Bank.” “ And your orator,” says' the bill, “distinctly charges, that the said transfer by the Ocmulgee Bank was made in contemplation of the insolvency of the said bank, and with full notice to the S. W. R. R. Bank, and was not intended to be for the benefit of the stockholders or creditors of the Ocmulgee Bank, other than the said S. W. R. R. Bank.” Then the statute of 1833 is set forth; “ and your orator charges, that the assignment and transfer, so made, as aforesaid, by the Ocmulgee Bank, was made in fraud of said law, and with a knowledge, on the part of the said S. W. R. R. Bank, of the insolvent condition of the Oc-mulgee Bank: and your orator insists, that the said assignment and transfer are null and void; and that the said S. W. R. R. Bank is bound to account for the said assets to your orator, as one of the creditors of the Ocmulgee Bank.”
Now, it has been twice argued that a plaintiff is only entitled to a decree according to the drift or frame of his bill; and that the exclusive object of this bill was to obtain a decree against the Rail Road Bank, as stockholder, for her rateable proportion of the bills held by the plaintiff' as collateral to his principal demand for advances; to the utter neglect of the principal demand, itself, and the liability for it, incurred by these defendants, by their improper abstraction of the assets of the Georgia Bank. But what say the passages Thave quoted from tho bill ? Do they not conclusively shew that the object of the bill was twofold: (1st.) to'charge these defendants with the assets withdrawn, by their contrivance, from the Ocmulgee Bank, — and thus obtain satisfaction, — so far as this accountability might extend — for the plaintiff’s principal demand ? and (2ndly,) to supply whatever deficiency might be left, or might exist, by calling in requisition their contributory liability as stockholders for the bills held as collateral 'l
And what is the prayer of the bill ?- That the transfers of *334 assets be declared null, and the Rail Road Bank decreed “ to (account for said assets to the creditors of the Ocmulgee Bank.” That the plaintiff’s claim against the Bank be established, and that, in addition to this, the bills in plaintiff’s possession be ascertained; and the Rail Road Bank “ decreed to pay upon the same, in average and proportion to the amount of stock held by them.”
See Story Eq, PI. 11.88,135.
This statement, accompanied by the prayer for general relief, contained in the bill, certainly sets forth the claims of the plaintiff as a general creditor.
A single passage from the answer of the Rail Road Bank, shows in what light they understood the matter: (1.) “These defendants are strangers to the circumstances under which the complainant advanced to the Ocmulgee Bank, the large sums of money for which he claims payment /” and (2.) “these defendants deny the right of the directors of the said bank, to bind these defendants to pay to one of their associates a further contribution, under pretence of a deposit of bank bills.” Does it appear from this extract, that these defendants were ignorant that the bill was intended to set forth a compound claim on behalf of the plaintiff, — as general creditor, and as bill holder, — the latter being presented as collateral, merely,, to the principal demand? Was there any ground for the surprise affected by counsel ? Could it possibly be supposed that the plaintiff had stated his advances, and the defendant’s interference with assets, liable for them, and had called on the defendants to account for those assets, — for no purpose at all ? and that so far from seeking payment of the advances themselves, — for the entire satisfaction of which the assets might prove sufficient, — the plaintiff was so stupid as to come into Court claiming from the defendants, only as stockholders, payment on the bills held by him, according to their stock: that is, asking payment of only one half of his real debt?
The next objection is, that the bill is not, technically, a creditor’s bill — i. e. the plaintiff does not sue on behalf of all other creditors of the Ocmulgee Bank, as well as himself.
The case of Wood v. Dummer, referred to in the decree, shows that this objection cannot apply to the plaintiff’s claim as bill holder; and must, therefore, like the preceding, be applied exclusively to his claim as general creditor, for advances.
There is some confusion on this subject of a creditor’s bill, which a little attention to general principles will be sufficient to remove.
The general rule is, that all persons interested in the subject of the suit, or directly affected by the decree, should be made parties. To this rule there are various exceptions; many of which turn upon the fact, that from the numerous *335 ness of persons thus circumstanced, it would often be “ impracticable to join them, without almost interminable delays and other inconveniences, which would obstruct, and probably defeat, the purposes of justice. In such cases the Court will not insist upon their being made parties; but will dispense with them, and proceed to a decree, if it can be done without injury to the persons not actually before the Court.”
story E. pi. note 1
Story Eq pl, 1,2,3.
16 Ves. 329.
See also Wood v. Dummer, 3 Ma 317.
Mit. Pi. by Jeremy, 17§.
“The general rule being established for the administration of justice, ought not to be adhered to in cases in which, consistently with practical convenience, it is incapable of application; for, then, it would destroy the very purposes for which it was established. The exceptions, therefore, turn upon the same principle upon which the rule is founded. They are resolvable into this : either that the Court must wholly deny the plaintiff the equitable relief to which he is entitled, or that relief must be granted without making other parties. The latter is deemed the least evil, whenever the Court can proceed to do justice between the parties before it, without disturbing the rights or injuring the interests of the absent parties, who áre equally entitled to its protection. In such cases, it will generally require the bill to be filed not only in behalf of the plaintiff, but of all persons interested.
“ The principle” (of the general rule) as observed by Lord. Eldon, in Cockburn v. Thompson, “being founded in conve-nienco, a departure from it has been said to be justifiable when necessary. And in all these cases, the Court has not hesitated to depart from it, with the view, by original and subsequent arrangements, ’to do all that can be done for the purposes of justice, rather than hold that no justice shall subsist among persons who may have entered into these contracts.” Of what is meant by subsequent arrangement, we have an illustration in the remark of Lord Redesdale, that, “ in some cases where it has appeared,” — not by the pleadings, — but, “ at the hearing of the cause, that the personal representative of a deceased person, not a party to the suit, ought to be privy to the proceedings under a decree, but that no question could arise as to the rights of such representa^ tive pn the hearing, the Court has” (as was done in this case) “ made a decree directing proceedings before one of the Masters of the Court, without requiring the representative to be made a party, by amendment or otherwise: and has given leave to the parties in the suit, to bring a representative before the Master, on taking the accounts or other proceedings directed by the decree, which may concern the rights of such representative ; and a representative thus brought before the Master, is considered as a party to the case, in the subsequent proceedings.”
There is a difference among cases, arising from their very *336 nature, which must govern the Court in its rules of practice. ^ There are, for instance, cases where the very right under ' which the plaintiff claims, implies that he, is entitled to its enjoyment, only in conjunction with other persons. 2. There are cases where no such implication necessarily arises from the nature of the right; but yet it may be shown, by the pleadings or proofs, that other persons have, in fact, a community of interest with the plaintiff. 3. And there are still other cases in which the claim set up by the plaintiff, is, in its nature, exclusive of other persons.
Story’s Eq. Pi. §ior.
Story’s Eq. Pi. s98-
td. §102.
Id. §108.
Story’s Eq. Pi. §109.
Id. §110, ill. Id. §113.
Of the latter (or 3d) class, there are numberless instances in the books. Such as mortgagees or others holding a lien, or suing to establish some peculiar interest, or seeking a priority of right. In such cases it would be error in the plaintiff to conjoin other creditors with him in the bill, or to sue in behalf of himself and other creditors. If it be necessary to take notice of the interests of the other creditors, — which are, in such cases, opposed to those of the plaintiff, they must be made defendants, or the Court must, on a proper case made by the answef, or acting of its own head, provide for their interests in its decree. ' .
Of the first class of cases mentioned, — where the nature of the claim made by the plaintiff in liis bill, shows that there are other persons jointly entitled with himself, — examples are furnished where suit is brought by a part of a privar' teer’s crew, against prize agents, for an account of the prize money; or where a portion of 'creditors, specially provided for in a deed of, trust, for the payment of debts, come to claim an execution of the trust; or where suit is brought by part of the proprietors and subscribers to a factory, against the agents for an account for misapplications and embezzle-ments of the partnership funds; or where some share holdérs in a joint stock company, sue to compel the directors to re-' fund monies improperly withdrawn by them from ,the joint stock, and applied to their own use; or where a portion of persons, associated for specific purposes, come into Court asking a specific execution of the original articles of subscription at tiie hands of their agents, or to set aside an agreement made contrary to their charter; or, in short, wherever a portion of persons interested, as partners or otherwise, jointly with others, come to claim a judicial vindication of their joint rights. In all such cases, the primary rule is, in equity, as it is at law, that all the persons jointly interested, should join in the bill. But, as' an indulgence, and to prevent intolerable delays and inconveniences, calculated to defeat the ends of justice, a few of them are permitted to sue on behalf of themselves and their companions, who are then regarded as parties.
In the two classes of cases we have been considering, the *337 general rule, as to parties — plaintiffs, is precisely the rule of the Courts of common law. He who comes to assert a culiar or distinct claim, cannot sue in conjunction with other persons; and he who sues in a joint right, must (except where an exemption arises from convenience or necessity) join all other persons interested with him in that right.
Mitf. Eq. Pl. jeremy, 166, 197
The middle class of cases, (mentioned as the second,) is where the claim of.the plaintiff does not, in its natiim, imply that it is exclusive of other persons; nor is it a joint right in the plaintiff and others. The claim of the plaintiff, in this case, as a general creditor of the Ocmulgee Bank, is of this description. If there are other creditors, he has nothing to do with them; nor is the assertion of their claims by them, essential to the establishment or recovery of his. If it be a rule of practice, either at law or in equity, that a general creditor cannot sue for and recover his own demand from the debtor, or from those who, by fraudulently interfering with the debtor’s property, have made themselves responsible, as trustees, for its payment, I confess my ignorance of the case or cases in which it has been established; and I am equally ignorant of the principle which should induce uS to establish such a rule.
At law, certainly, every creditor must sue for himself, and cannot join the case of any other creditor. In equity, he may sue for himself; and the permission given him to sue, also, on behalf of others, is an indulgence which is partly recommended by its convenience, and partly arises from considerations which, without touching his right to maintain his bill singly, form, more properly speaking, a mere impediment to the making of a decree, if in the progress of the suit it becomes known to the Court that there are other creditors, without doing complete justice and protecting their interests.
Where a rightful trustee (for instance an executor) is sued for the debts of his testator, he is entitled to the protection of the Court, and has a claim that the decree shall be such as to defend him in the due administration of the estate : (in which respect, perhaps, trustees who have made themselves such by their own wrong, may stand differently,) yet, even in that case, a single creditor may sue on his own behalf.— Lord Redesdale lays it down, expressly, that such is the law of this Court j and says, “ it is rather matter of convenience than of indulgence, to permit such a suit by a few, in behalf of all the creditors.”
The same doctrine is recognized by Professor Story. (See St. PI. §100, note 1; and 2 Story Eq. §890, note 2.)
And it appears that where a single creditor sues on his own behalf, the Court will protect the defendant, and prevent the plaintiff from obtaining an undue preference, by making a decree for an account, (if assets are not admitted,) and that *338 the plaintiff’s demand be paid in the course of administra-fáon . jn consequence of which the executor will be allowed, discharge, for all proper payments, (see Story Eq. PI. §100, noj.e and the authorities there cited ;) or the Court may, upon such a bill, if occasion appear, either on the face of the bill or from the answer, or the proofs at the hearing, make such a decree as was made in this case, both for the protec-ti°n of the defendants and of the other'creditors — that is, it may caH m the creditors before the Master, to take the benefit of a general account; and creditors thus coming in before the Master, are entitled to rehear the cause — though not tech-ideally parties — because the decree affects their interests,
§100Snote l Gifford v.' Hort, l Sch. and Left 409; Eq epi. §99^S note i’ and §365, note l.
Story’s Eq. Pi. §100, note l.
See also Wi-Tjohns Ch7’ Rep. 438;' McKay v. _ 38 and Hallet Hallet, 2 Paige Rep. 18,’ 19.
see also Stoerey' Eq. §94 105, and notes.
The case before us is, in principle, analogous to that of a creditor seeking satisfaction of his debt out of the assets of his debtor, in the hands of a personal representative.
“When,” says Professor Story, “a single creditor sues for his debt, (as we have seen that he may,) he need not make any person but the personal representative of the deceased, a party. We have also seen that, in such a suit, the usual decree is not to direct a general account of the whole estate, but only a decree for an account of the personal assets, and the payment of the debt in the course of administration.— But, although this is the usual decree, it is not, therefore, to be considered as absolutely incompetent for the Court, upon such a bill, to make a more general decree, for a general account, as is done in case of a common bill for all the creditors. On the contrary, a case may be made out, upon the answer and proofs, which may render it, if not indispensable, at least highly expedient for the Court, for the purposes of justice, to adopt the latter course.” (1 Story’s Com. on Equity, §546, and the authorities there cited.) “In this last case,” Í113 Proceeds, “ Mr. Chancellor Walworth used the following language: “I apprehend the reason why one creditor, or one legatee, who has a specific claim against the estate, may sue in his own name only, and yet that a decree may be made, such bill, for a general distribution of. the fund, to be this : It does not appear on the bill, that there are not assets to pEy aq creditors or legatees, and, therefore, no general account and distribution of the fund may be necessary. I understand the rule, in that case, to be, if the executor admits a sufficiency of assets, there is to be a decree for the payment of the particular debt or legacy, without any general decree lor an account.” “ But, if by the answer of the defendant, it appears there will be a deficiency of assets, so that all the creditors cannot be paid in full, or that there must be an abatement of the complainant’s legacy, the' Court will make a decree for the general administration of the estate, and a distribution of the same, agreeably to equity.”
In the case before the Court, a single creditor sues to re *339 cover his debt, out of assets, liable to it, in the hands of the defendants, whom he seeks to make liable, as trustees, for its payment. In such a case, if it appear upon the face of the bill, (as I think it does,) that there are other creditors, having pretensions to payment out of the fund, then the plaintiff has stated a case in which the defendants are liable to the other creditors upon the same grounds of Equity on which he asserts their liability to himself, and the Court, unwilling that the defendants should be subjected to various suits, resulting, perhaps, in their being made liable to an aggregate amount exceeding the assets in their hands, and out of which their liability arose, may, (if an account to creditors generally is not claimed, as I think it is in this bill) order a formal clerical amendment of the bill, so as to make it present a claim on behalf of the plaintiff and such other creditors as will come in and contribute to the expenses of the suit. In such case, all the creditors are considered parties, and the defendants are generally released from responsibility to such as neglect their privilege by failing to come forward and sustain their demands. This is as far as the Court ought to go, even where the plaintiff’s bill shows the existence and claims of.other creditors. But in that case, also, it is competent for the Court to direct the other creditors to be called in before the master, as was done in this case, and that affords just as effectual a protection to the defendants and to the creditors, and occasions no delay. Besides, it accords with a well known practice in our own Courts.
But if a plaintiff confines himself to the statement of his own particular demand, which may well happen, — (as, for instance, if he be ignorant of any other,) though his bill must be sustained, the defendants are not without remedy, but have it in their power by their answer to make known the existence of other creditors, and the probable insufficiency of the assets in their hands to satisfy themj and to claim a decree for their own protection by calling in the creditors. The attention of the Court may also be drawn to the necessity for such a decree, by the proofs at the hearing.
Surely these defendants have suffered no injustice by the form of the decree in this case, which, while endeavoring to protect them from further liability, took cognizance of the interest of other creditors, though the answer showed no solicitude upon the subject.
The next objection is, that the decree extends relief beyond the objects of the plaintiff’s bill, in making the Rail Road Bank liable for the extinguished debts of Lamar, &c.
The bill charges a fraudulent interference with the assets of the Ocmulgee Bank, and though the plaintiff had learned enough of the modus o'gerandi to be able to charge that these defendants had taken a part of the assets to themselves, *340 and had agreed to give up others to the debtors on them, he his ignorance of the particulars of the fraud, and calls for a discovery. At the hearing, he was able, notwithstan-¿jng t¡ie meagerness of the answer, to prove the particulars embraced in the decree. I had always supposed that, upon a bill filed for discovery and relief, the plaintiff was entitled, under a prayer for general relief, to a decree according to the discovery obtained, and the other proofs made at the hearing ; and my impression seems to be justified by a blasphemy which has obtained currency in the Court, and grown into a maxim; the merit of which is divided between Lord Hard-wicke and one Robins or Dobbins.
Story Eq. PI. andsee§28 and note i;and §§25et seq.and ^eVto^and notes.
It would be very strange to require a bill, filed for the discovery of facts, and for relief corresponding to the discovery, to be amended, so as to tally, in its charges, with the information when obtained. This would appear like returning to the exploded practice, with all its delays, of filing one bill for -the discovery, and another for relief grounded on the discovery made.
Under cover of this ground of appeal, the plaintiff, also, made an objection at the last argument, which it may be proper to notice here. It is, that the appeal opens the decree :— and the decree being opened, he is entitled to have the Rail Road Bank declared liable, as stockholder, for the stock of Lamar and others, which was, by their connivance, declared forfeited.
This objection, if well founded, would only go to shew that these defendants should be regarded as owners of the stock of Lamar and others, in addition to their own 2750 shares. And the relief arising to the plaintiff from that, would not be a liability to him as a general creditor, but a liability to contribute, in proportion to this additional stock, to take up the bills in his hands.
A decree is not opened generally by an appeal. It is opened to the extent of the appeal taken: and, so far as that disturbs the subject matters of the decree, the appellee is eniitled to apply, incidentally, for its modification in his behalf, but no further.
But it is apparent that, regarding the forfeiture of Lamar’s stock, and that of others, referred to in this objection, as fraudulent, the stock did not vest in these defendants, but either reverted to the original owners, or now belongs to the Oc-mulgee Bank. Neither these share holders nor that Bank are parties to this suit, and no decree can be made in relation to their stock. The original stock held by the Rail Road Bank, which was fraudulently forfeited, was held to have reverted to them, upon the same principie now announced.
The next objection, on behalf óf the appellants (the Rail *341 Road Bank) is that the decree, in allowing creditors to prove against the funds for which these defendants are made liable, postpones the demands of these defendants to those of all other creditors.
4 Johns. Rep. 598-9.
80.
I do not perceive that any such ground was set down for argument, and for that reason none such should be noticed. But as some of my brethren have suggested it, I shall consider this objection also.
The Rail Road Bank obtained possession of assets liable to creditors; and it is admitted that the fraud by which this was effected was such that they are not entitled to hold the funds, and yet it is claimed that they are entitled to prove as creditors, pari passu with other creditors, against them; in other words, that the funds in their hands are to be deemed a security for their own demands as creditors.
If this be allowed, it will, in my conception, be against the spirit of the authorities, and I am very sure it will be against justice and policy.
The well settled doctrine is that where a transaction is set aside as fraudulent, merely by implication, or where the evidence of intentional fraud is doubtful, the funds improperly diverted may be permitted to stand as a security for debts or advances; but where, as in this case, the fraud was intentional, and is established by clear evidence, the best authorities, supported by numerous undisputed cases of our own, have settled the principle, that no such decree can be made.
I shall select what is said by Ch. J. Kent, in Sands v. Codwise, to illustrate the doctrine. “I hold,” says he, “the two deeds to be grossly fraudulent and absolutely void, and this brings me to consider the next question in this case, which was, whether the deeds ought not to stand as security to reimburse the sons for their advances, and to indemnify them against their outstanding paper.” “ On the ground of absolute fraud, the deeds are void to all intents and purposes. It is the same thing as if no such deeds had ever been executed. A fraudulent conveyance is no conveyance, as against the interest intended to be defrauded. It is impossible that these deeds can be permitted to stand as a security, if they are to be adjudged void ab initio. If they have no lawful existence, it would be inconsistient and absurd to recognize them for any lawful purposes. I presume there is no instance to be met with, of any reimbursement or indemnity afforded by a Court of Chancery to a particeps criminis, in a case of positive fraud. In Smith v. Loader, a party advancing money to agent, under a combination with him to cheat° the principal, lost his whole security from the principal for the money actually advanced to his agent. It is fit and proper that this result should take place, as a contrary course might afford *342 some countenance to fraud, by giving it partial effect. It would not become a Court of Equity to take a single step to save harmless a party detected in a fraudulent combination to cheat.”
Harp. Eq. Rep. 145; l Hili S^Id 951.' McMullen Eq. R. 27.
Harp. Eq. 145.
Id. 151-2.
1 Hill Ch. 294.
1 Yem. 465.
2 Vem. 678; ot> w 2P. Wms. 203.
1 Johns. Ch. Rep. 478.
Our own cases of Miller v. Tollison, McMeekin v. Edmunds, Fryer v. Bryan, Parker v. Holmes, and Anderson v. Fuller, five cases decided in the order in which they have been stated, clearly establish the same doctrine as the doc-of this State.
In Miller v. Tollison, a house and lands were conveyed,absolutely on the face of the deed,' — to secure a debt actually due, at a nominally high price, and of value far beyond the amount of the debt; but the deed was further intended to cover the property from creditors. The conveyance was declared fraudulent and void, and not allowed to stand as a security for what was actually due. The circuit decree had allowed the deed to stand as security for the debt. “ But,” say the Appeal Court, “ we are of opinion that the decree did not go far enough.” “ The Court is of opinion that, although there may be something due by Tollison to Holder, the latter is not entitled to the benefit of the conveyance as a security for what may be found due ; because the deed, making an absolute conveyance of the land by Tollison, for a large nominal price, was intended as a fraud to cover his property from his creditors ; and as Holder lent his name to this fraud, he ought not to derive any benefit frpm it.”
In McMeekin v. Edmunds, Harper, J. delivering the opinion of the Court, said, “In several English cases, even where the defendant appears to have been a partaker of the fraud, but the proof was not entirely clear, the Court has set aside the conveyance, decreeing it to stand as a security for the money actually paid. Herne v. Meeres was a case of this sort. The Chancellor says, “ and so at law, where a case is found to be fraudulent, the creditor comes in and avoids it all, without repayment of any consideration money ; and in equity, therefore, where the Court can decree back the principal and interest, there is no hurt done; and a lesser matter, in such case, will serve to set a conveyance aside.” Addison v. Dawson, and Clarkson v. Hanway, were cases in -vp-hioh, upon setting aside the conveyance, the Court decreed the defendants to be refunded what they had actually paid. In Boyd v. Dunlap, where the consideration was very inadeqUate; but the proof of actual fraud in the defendant doubtful, the Court set aside the conveyance, allowing it to stand as a security for the money actually paid. Chancellor Kent says, “ Courts of, law can hold no middle course. The entire claim of each party must rest and be determined at law, on the single point of the validity of the deed ; but it is an ordinary case in this Court, that a deed, though not absolute *343 ly void, yet if obtained under inequitable circumstances, should stand as a security for the sum really due.” In How v. Wildon, though there was actual fraud, — dolus in re ipsa, as the Master of the Bulls expresses it, — the deed was allowed to stand as a security for the money paid. I think, ever, that our Court of Equity was right in determining, in Miller v. Tollison, that where the defendant was a partaker of the fraud, he should not be allowed to derive any advantage from the conveyance: and therefore, tohere it was made to secure a previous debt, it should be set aside absolutely.
3 yeg< 51g
State ReP- Eq. 345-
2 Hill Ch.56.
Id. 59-60.
Id. 61.
2 HillCh.95.
Miller v. Tollinon, State R'ép. 145.-
1 Johns. Ch. Rep. 479.
: McMullan’s Eq. 32.
1 Hill Ch. 294.
State Eq,. Rep. 145.
In Fryer v. Bryan, a bond and judgment, fraudulently obtained, with a view to cover a debtor’s property, were set aside, and not allowed to stand as security for a debt claimed by the defendant, who had taken them, and upon appeal, the Court (Johnson and O’Neall, JJ. — Harper, J. absent,) said, “ The fact that the bond and judgment were intended as a fraud on the creditors of Lemuel Bryan, is ascertained by the Chancellor’s decree, and is fairly sustained by the evidence : and, as a party to that fraud, the defendant, Bryan, is entitled to no favor. The Court was not bound to disentangle a web of fraud, of his own manufacture, to ascertain that there may have been some good material mixed up with it.”
In Parker v. Holmes, the whole Court of Appeals, in firming the decree, said, per Harper, J. “ when actual fraud— dolus malus — is clearly proved, the judgment or conveyance is wholly void, and will not be permitted to stand as a curity for what is actually due. But where equity infers fraud from the circumstances and relation and character the parties, it is at the discretion of the Court to allow the security to stand good for what is actually due.” It was judgment which was set aside in this case.
In Fuller v. Anderson, the same doctrine is recognized : and Harper, Ch. speaking for the Court, said, “ In general, Avhen a conveyance is set aside for fraud, it is within the discretion of the Court to decree the conveyance to stand as a security for the money actually paid. This is done, where there is no imputation of moral fraud, or the proof of actual fraud is, in any degree, doubtful. See McMeekin v. Ed-munds, and the cases there referred to. And this does not disagree with the case, of Miller v. Tollison, where a veyance, absolute on its face, having been made to secure a previous debt,* and the grantee having attempted to set it *344 up as an absolute conveyance against creditors, the Court , woui¿[ no(; allow it to stand as a security for money actually due.” And referring to the case before him, — which, in some reSpects¡ was governed by Smith v. Henry, he proceeds, “ As the rule of Smith v. Henry is an inference of strict law, on account of the danger of any other construction ; as it may be that there was no corrupt agreement between the parties, ’ but an act of spontaneous kindness and indulgence on the part of the grantee, perhaps it would be,' generally, proper, when setting aside a conveyance on the legal inference alone, to decree it to stand as a security for any consideration advanced at the time.”
i Hill Ch 52. ’
It appears to me that if we look to the spirit of these authorities, our own cases particularly, and consider that the suppression of fraud requires that no aid should be afforded to any party intentionally guilty of it, we are bound to declare, that in cases of moral and intentional fraud, no jjarticeps criminis is entitled to have any part of his debts or advances out of property or funds improperly in his hands, until the innocent creditors, whom he attempted to injure, are made whole. It is not enough that he be deprived of the property, as a security giving him a preference over other creditors. He should lose his money or his debt, as against such creditors. The consideration proceeding from him, as the procuring cause of a corrupt assignment or conveyance, should savour of the transaction with which it is connected ; and should be considered as forfeited, as between him and the innocent parties, whom, if he had not been detected, he would have irreparably injured — perhaps ruined. It is enough that, after these are satisfied, the . transaction should be recognized as between the confederates, and the advances or debts allowed. Indeed, if there is any thing questionable in the decree, it is not the postponement of the Rail Road Bank’s demands to those of other creditors, but the allowing it against the Ocmulgee Bank, after the other creditors are paid. These demands were allowed, however, as between the parties, only because the Ocmulgee Bank was not deceived in the transaction. If it had been otherwise, if the assignment had been procured by a deception practised on .that Bank, and she had filed her bill to set it aside, all the authorities concur as to the law. A party deceived and coming for relief, stands upon this footing — - the conveyance is set aside absolutely, and is not allowed to stand as a security for advances. In other words, the fraudulent party loses his money. This must be the construction ; for if it is intended that the money be repaid, why de-1 prive the party entitled to re-payment, of a security to en- ’ force it 1 If such be the rule where the party from whom the conveyance was obtained seeks the aid of the Com.. *345 how much stronger the reason for such a decision, when creditors, and not the party himself, come to be relieved ?
paley on Agency by 2 Loyd 99 Carter v. Bocher Burr, Oockfor’d v. Wenter Camp. 127; Nixxon 1 strá. 653.
This is a doctrine conformable to justice and sound policy, and goes not a whit beyond the spirit of the decisions by which they were intended to be upheld and supported; contrary doctrine is an actual encouragement to fraud; for what restraint is left to fetter the dishonest, or terrify the cunning, if they are to have all the profits of their corrupt enterprises. if not detected in them, arid are to lose nothing if they are-?' ' . .
If the doctrines which I have endeavoured to vindicate are recognized, the only question is, whether the fraud perpetrated here, is of the character I have described; and whether the Rail Road Bank is to be exonerated from the consequences of it, on the ground .that it was perpetrated by its agents, arid not -by itself. . I speak of it only as the act of the agents; and am willing to assume that it was done without special instructions; though it is in proof that there .were instructions of some' sort, which have not been produced or accounted for; and though what was done, when made known to the principals, was approved by them. But that parties are bound, civiliter, by the conduct of their agents, does not admit of doubt; and has not been questioned by Counsel. Would the Rail Road Bank dispute the ability of their officers and directors to bind therri? These are but agents; and upon the very same grounds arid principles which would excuse them from responsibility for the acts of their agents sent by them to Macon, they must be excused from every contract and transaction of their institution.
Then, as to the character of the fraud — is there any doubt about that? Why, these defendants, themselves being judges, have declared the enormity to be such, as' totally to corrupt and destroy all rights arising to'them under it!'
What are the circumstances? When these defendants entered into the Ocmulgee Bank, it is proved-by their own witnesses to have been as sound as any Bank in Georgia. They obtained the control of it, and in the first year of their. administration, its issues were distended beyond the ordinary means of the Bank to sustain. A call is made upon the stockholders to pay in further instalments, agreeably to the charter,' in order to maintain the issues. This these defendants resist and protract; until, in their own opinion, the credit of the institution is in danger. They then make advances; but too scanty, for the purpose. The plaintiff is then applied to, to supply the deficiency. They are informed of the fact, and make no objection. The plaintiff proceeds with his advances ; the benefits of which were received by these stockholders, in the proportion which their 2,750 shares bore to the 5,000 shares of which the Bank was composed — more *346 than one-half. They were informed of these advances as ¿hey were made, and might have stopped them, if they deemed them in any respect objectionable. But they were gpgj^ an(j permitted their Bank to draw money, from time to time, from Johnston, until his advances amounted to one-fifth of the whole capital stock. These advances were made to take up bills on which these defendants were liable, to more than one-half their amount; and were so applied.
One would suppose that, under these circumstances, and by ordinary men, such a debt as this would have been held sacred. And yet it was not so regarded by these parties. With a full knowledge of its existence, and a full knowledge of the securities given for ensuring its payment, and with a very shrewd suspicion of the condition of the Bank, these defendants proceeded, in the persons of their agents, by trick and contrivance, by insincere promises and hollow representations, and by bargains, only the more corrupt because sufficiently specious to impose upon some, whom it was necessary to deceive, in order to make them unsuspecting instruments, to divest themselves of their stock, and, with it, to rid themselves of their liability to bill holders; and, at the same time, and in the face of an express statutory prohibition, to serve themselves out of the larger and more valuable portion of the assets, liable to the plaintiff and other creditors, and to give the rest away.
Now, every member of this statement is founded on the evidence in the case: and how shall we characterize this transaction, otherwise than as an actual, intentional fraud, condemned alike by conscience and by law 1 Instead of encouraging it by impunity, and restoring those to whom it is legally chargeable, to the same condition as if it had never been perpetrated, it is the duty of a judicial tribunal to meet it with all the energy of the law; and by a firm and manly exercise of authority, so to rebuke it, that, so far as human laws can effect such an object, all men, whether weak or wicked or avaricious, may be deterred and deprived of all motive for following its pernicious example.
On this branch of the case I feel more solicitude than upon any other: because I am firmly persuaded that justice and true policy are more concerned.
If, however, I am mistaken in supposing that the Rail Road Bank should be postponed as a creditor, upon the grounds I have taken, there is another ground, to which I shall hereafter advert, in another connexion, which is sufficient to postpone her. It is that the interference with and wasting of the assets of the Ocmulgee Bank was a breach of trust, produced by a combination between the directors, who were trustees of the funds in their hands, and these defendants, who, as stockholders, and as creditors, (if they were such) *347 Were cestui que trusts; and in such a result, produced by such a combination, the primary liability is upon the cestui que trust who was a party.
There is but one more objection to be noticed, before proceeding to consider the plaintiff’s claim as bill holder. It is contained in the fourth ground of appeal, which is singular: ‘•'Because the decree requires the South Western Rail Road Bank to account for the value of assets shewn to have been wrested from them by the laws of Georgia, — which are now in the custody of the law in Georgia, for the benefit of the creditors, generally, of the Ocmulgee Bank, and to which these defendants have renounced all claim.”
When I pronounced the decree, I did not conceive myself to have had any evidence before me, that the assets relerred to were wrested from the hands of the Rail Road Bank, or were in the custody of the law of Georgia, or that they were there for the benefit of the creditors, generally, of the Oc-mulgee Bank. The fragment of a record was offered to prove these facts, or some of them, but, on accout of its imperfection, it was objected to, and rejected; and in the argument of the case, no further allusion was made to the subject, so far as I remember. I, therefore, supposed these was no evidence. It appears, however, that there is some incidental testimony; though not sufficient to bear out, at least very fully, the statements contained in this ground.
It appears that a receiver has been appointed, at whose suit a portion of the assets, probably the larger part or the whole, have been attached in the hands of Mr. Nesbit, the Rail Road Bank’s attorney. But I see no evidence that the Rail Road Bank ever renounced their claim to the assets before the filing of their answer, if, indeed, the answer makes a renunciation of claim. It would rather appear from the evidence, which was taken in this case after the filing of the answer, that they were still claiming them, in some way or other; for it is said that the Rail Road Bank had not realized any thing on them ; and the reason given is, that they were attached in the attorney’s hands, and were ever since in litigation.
But admitting that they were attached and are in the hands of the law for administration; whose fault was it that they were in these defendants’s hands to be attached ? Is this plaintiff, or any other creditor, who was defrauded by the taking possession of them, obliged to quit his hold of these wrongdoers, who have made themselves liable to them, and whom they have caught in the very act; and to resort to another forum, for redress against other parties, perhaps less capable of responding to them; and to take as the measure of their relief, the eventual value of the assets, perhaps depreciated by the laches of these defendants, or in consequence of the im *348 pediments to their collection, while good, which were created by the incidents of the attachment suit? Was it ever heard before, that the responsibility of a tort feasor was discharged, jjy an attachment taken out against him? Or by hisrenounc-ing claim ? What matters it to the plaintiff what these defendants have done, or intend to do, with the securities they improperly possessed themselves of? Suppose they had burned them, or thrown them away. Suppose their motive for taking them was not to profit themselves, but to do him an injury, what then? It is not the use made of them, but the taking them, which constitutes the wrong, and creates the liability: and the wrong, and the liability for it, were both complete when the assets were abstracted, and the plaintiff’s remedy impeded; and the liability is not removed by any subsequent proceeding. It would be very different with respect to persons rightfully in possession: but that is not the predicament of the Rail Road Bank.
StokeTuVes 319; Booth v! Booth, i Bea. Montfort v Cadegan, 19 Ves. 639.
Besides, it may be observed that the assets in the hands of a receiver, for the benefit of creditors generally, may not afford the plaintiff as ample a remedy as I think he is entitled to at the hands of these defendants. As against a receiver, the defendants may. probably, come in pari passu with other creditors : whereas, Í think, in this suit, their demands should be postponed.
In this connection, it may be observed that the plaintiff’s remedy, through a receiver, must necessarily be limited to the assets of the institution that come to his hands, and will not involve a full administration of the affairs of the bank ; and, therefore, the remedy may not be more ample, indeed may not prove as ample, as that which he may obtain in this suit; in rvhich the Court, without assuming the general administration of all the assets of the bank, undertakes to administer that portion of them for which these defendants have made themselves responsible.
There is another principle, well settled, which shows that the primary liability is on the Rail Road Bank. If the plaintiff proceeds against the funds in the hands of the receiver, the latter is to be regarded, in some respects, as the successor of the Directors of the Ocmulgee Bank. But these officers were trustees, for creditors and stockholders, of the assets in their hands, and the Rail Road Bank were, as stockholders, a portion of the cestui que trusts. The wasting of the assets, by a combination between these parties, constituted a breach of trust> iQ fraud of the creditors and other stockholders : and it is a clear principle that where a portion of cestui que trusts join with a trustee in a breach of the trust, the primary lia-ki^ty is llPon the former: that they are estopped by their concurrence, from claiming from the trustee, but on the contrary, are bound to indemnify him; and that the trustee is *349 liable to other cestui que trusts, is admitted law. If this position is true, we should, in sending the plaintiff to the v receiver, be turning him round from a primary to a secondary liability.
And, after all, why should not the defendants make com-! pensation, here, for the assets, at their value when they received them; and take them there as they may turn out 1 The plaintiff might probably have made his debt out of them long ago, if they had not interfered with them. As it is, the assets will be as valuable to them as to him: and as they have chosen to take them, it is no injustice that they should abide by them.
Upon all the subjects which I have hitherto noticed, I can see no room for a division of opinion. I think there should be no division. I come, now, to consider the plaintiff’s claim as a bill holder; and when I have concluded my observations upon it, I shall cheerfully submit to those who will give them a candid consideration, whether they leave any more ground for diversity of judgment.
Before 1 proceed to the more direct questions upon this point, I shall notice one which the counsel did not touch in their argument, but which was brought into discussion after-wards. I apprehend there is no great difficulty in it; and for that reason, perhaps, it was not raised or discussed by counsel.
Assuming that the stockholders are bound for the bills in the plaintiff’s hands, the question is as to the nature of their obligation, — in respect to time. The charter declares them bound “ for the ultimate redemption of the bills.” Are they bound only after the plaintiff shall have sued the Ocmulgee Bank, and failed to realize the amount of the bills held by him ? Conceding that the charter contemplated this order of liability, it certainly presupposed that there should be a bank and a corporation to be sued. But when it is considered that these defendants, by their own wrongful act, disorganized and dissolved the corporation, and took away or abstracted the primary remedy against it, will it do for them to excuse themselves from their secondary obligation, because resort has not been had to the institution primarily liable 7 Had they, themselves, not extinguished it, it would still have existed for their exoneration. But, surely, he who wrongfully obstructs a remedy, has no cause to complain that it has not been resorted to: and those standing in the condition of sureties, have no ground to complain that they are made liable according to the contract by which they are bound, when it is shown that they have removed their principal out of the reach of the creditors.
If it be said that it is in the power of the plaintiff, as a creditor of the bank, to implead the stockholders, and com *350 pel them to pay in further instalments, and thus provide a (fund to satisfy his demand: the answer is, that the words of ' the charter, declaring the stockholders ultimately liable for the redemption of the bank bills, are not to be understood in a sense that renders such a proceeding a prerequisite to the stockholder’s liability. Ultimate, in the charter, (if it signifies a postponement of the stockholder’s liability,) plainly means, after resort to the institution, as it existed when the bills were issued. It was the business of the stockholders to see that all the stock was paid in which was necessary to the redemption of the bills issued; and if they permitted bills to go out, upon which they were to be personally bound, without having brought in sufficient stock to redeem them, it was their own fault, and they have no cause to complain when made liable on them. And, if it were otherwise, who are the stockholders? Has the Rail Road Bank, by her pleadings, told us who or where they were; or given the plaintiff “ a better writ ?” She has extinguished the corporation, which, according to the charter, was the artificial person to be called on to redeem its bills; and should, therefore, stand ready to redeem them herself.
Miller v. Ball, 1 Burr. 452. Byles on Bills, 120. Damfott v. Buffalo, 9 Paige, 14; Story on Bills, §88. Story on Prom. Notes, §18, note 8. Id. Id.
When it is considered how numerous the stockholders probably are, and the inconvenience of the remedy pointed out by this objection, is it too much to say that these defendants are not entitled, under the circumstances of this case, to turn the plaintiff round to it ? Besides, they have indicated no desire to do so. They have not, either by their answer or at the hearing, or at any subsequent stage of this case, intimated any desire that the stockholders should be compelled to pay in all their instalments; and possibly it might be the last thing they would wish to do on their own part, though not averse to its being done by others : and I think they should be left to their own choice in this matter.
Having disposed of this preliminary matter, I come, now, to consider whether the plaintiff is entitled to a remedy on the bills in his hands.
It may be well to state, in the first place, some of the legal qualities of bank bills.
They are so far regarded as money that it is criminal to steal them.
There is no difference between such bills and common negotiable notes, in respect to the title and power over them, which the holder acquires.
They may be pledged or specially deposited._
But they are not in reality money: their real legal quality is that of promissory notes.
They are not a lawful tender, if objected to.
Though treated, in common business, as cash, they are distinguishable from it; and often pass at a variable discount.
gtory on Prom. Notes,' §18, note 8; Kent, 76, part 5, §44; Lange McC. Rep1 115.
harley v. Thornton 2 Hill rep. 509. ; Ontario v. Lightbody, 13 Wend 101.
A promissory note, payable in such bills, is not a note for money : (resembling in that respect a note payable in paper 4 medium;) and is, therefore, not a good note under the statute.
A payment in bank bills is not unqualifiedly a payment in money. Such bills are governed by the same rules that are applicable to negotiable notes and bank checks; and where the bank, whose bills are received in payment, has stopped payment, neither party knowing it, it is no payment.
Now these are the qualities which the law has affixed to, and the purposes which the law has declared are to be accomplished by, bank bills. The subserving the purposes which the law has determined may be accomplished by such paper, is the object for which its issue is authorized. The public policy is, that it shall answer this object and design, by fulfilling, not one purpose alone, but all or any of the purposes which its legal qualities fit it to accomplish, as the occasion may require. It is vain, then, to talk vaguely and indefinitely about public policy, without looking into all the particulars in which it is concerned. The man who does not take a bank bill as money, but who purchases it at a depreciation, according to its marketable value, is a part of the public, and entitled to rely on his security. He would be no less one of the public, and equally entitled to rely on the security of the bill, though he bought it at a depreciation, at the counter of the bank-itself. The man is a part of the public, and to be recognized and protected as such, who does not take bank bills as money, to pass them off as money, but receives them upon pledge and as securities. He does not cease to be a part of the public, nor lose his right to be protected as of the public, though the pledge be made to him by the bank itself. The things received in all these cases, are still bank bills : without any mutation of the legal qualities or incidents inherent in them, produced by the manner in which, or the purpose for which, they are received. If the purpose is lawful, and bank bills, according to their legal effect and qualities, whether- regarded as money, or as securities for money, will accomplish it, and the contract be upon a good and lawful consideration, the law must, upon grounds of public policy, uphold the transaction, and, when called on, enforce the bills for the benefit of him who has received them.
It is equally inconclusive to distinguish between banks of deposit and banks of circulation, and to tell us that the object of the latter is to furnish a par currency. The currency which is to be furnished by them, it should be remembered, is to consist of securities, and not money; and the circulation of it, in its true philosophical as well as legal sense, is the application of these securities to the purposes of trade, according to the exigencies and purposes of those into whose *352 hands they come. If the-condition of one individual indu-ceg t0 receive them for the purpose of passing them ofF, or demanding payment at the bank, it may be the interest anotper) ancj quite as suitable to his convenience, to hold as a security without demanding payment; or to retain them from the general circulation. Still they are nothing but securities; and still they are in circulation while in the hands of the one or the other of these persons.
Nor is the value of these securities, as a medium of commerce, in the slightest degree affected, whether their circulation be of the one kind which I have described, or the other. The man who has occasion for securities, will look as closely to the value of the security he takes, as he' will who, having occasion for money, receives' the bill to. pass it oif.
Equally idle is it to argue, that because the. Georgia Legislature, which emanated this charter, has prohibited individuals from issuing currentnotes.; therefore, the notes of her incorporated banks are invested with the peculiar qualities of money, and have none other, and shall be put to no other use. What she has authorized her banks to issue, are, in law and in reason, notes and. not money; and whether, in business, they are capable of standing as money, does not depend upon their being issued by the bank, nor upon their being issued as.money, but upon their being, when issued, a" good security for it, however they may be received or applied. It is this which gives them credit; and their credit depends upon the means of the institution, and the remedies provided by the Legislature, for the redemption of the.bills. The evident design of making the stockholders collaterally liable for the bills issued, was to uphold their credit; and if we refuse to enforce their liability, in this case, (the bills being issued by the bank, and binding upon her,) we are not promoting the design of the Legislature, but flying in the very teeth of her enactment. /
It has been urged that in order to bring in requisition the liability of the stockholders, the bank must issue their bills as money. The charter contains no such provision, and we have no right- to interpolate it. The charter declares that the obligation arises' upon “bills issued by and.from the bank.” The question, then, is not, did the bank issue these bills as money, but, did she issue them ?. She has made the bills in the form which the statute requires; and she passed the property in them to a third, party, upon a lawful consideration ; and I apprehend that no other definition can be given of an issue by the bank, than a transfer of right and dominion.' What is demanded by the defendants, as the requisite of a perfect issue, is, that the. bills should be parted from as money. But that is what no bank (except under governments which declare such bills tó be money, and a *353 lawful tender as such,) ever did or can do. The issue is of securities; which, when issued and found capable of standing as securities in the various positions to which the necessities or convenience of the community may consign them, are, by the consent of business men, applied to the purposes of money in exchanges.
Were the bills, in the hands of the plaintiff, issued by the Ocmulgee Bank ? They were issued, if, by putting them in his hands, the bank created a liability against herself upon them, either presently or prospectively. If he obtained a property in the bills, beyond the control of the bank, how can it be said that the bills were not obligatory on the bank, according to their import and legal effect, whenever, by the terms of his contract, he became entitled to enforce them ?— The agreement, not to pass them off, did not make the bills less his property, nor did it change the legal qualities, nor alter the contract, which their face imported. The agreement was altogether outside of the bills. The pledging of a thing does not alter the nature of the thing pledged. If bullion is pledged, it remains bullion; if coin, it continues to be coin ; and if bills are pledged, they are still bills as before.— If bank bills be money, as has been earnestly contended, then, emphatically, these bills were well pledged; Can it be doubted that a bank may pledge her coin as well as her bullion? Nor (by the way) can the argument advanced be maintained, that if the bills were hypothecated, then they operated as a payment, pro tanto, of the plaintiff’s advances. They were not paid to him, but pledged as a collateral security, to be enforced as such. His principal demand, therefore, remained until it should be satisfied by a direct payment, or until the collateral security was taken up.
But to return ; as I said, if the bills pledged be regarded as money, the pledge was undoubtedly good. The only doubt arises from their being not money, but securities merely.
Bank bills may be pledged, as we have already seen. This bank could have pledged the bills of any other bank. She could have done the same with any other property she owned ; and she could pledge her own bills, if the pledging amounted to an issue of them, so as to make her liable upon them.
Now we have examples, in the case cited in the decree from New York, and the two cases also referred to in the decree from Georgia, all going to show that such a proceeding is not unfamiliar elsewhere and it is a practice not unknown among ourselves.
We have, also, the authority of the New York case,, that it does create a legal obligation, as against the bank by which the pledge is made.
What is more material is, that in the second Georgia case,, *354 mentioned in the decree, we have an undisputed and express (decision from Georgia, whose judicial determinations are conclusive upon us, that the pledge of her own bills by a bank, is not only an issuing of them, so as to make them valid against herself, but that it draws with it the collateral securities, provided by her charter, for the ultimate redemption of the hypothecated bills. And this judgment was rendered in the administration of the same subject matter, and by the same Judge who decided Collins’s case, and upon the report of the same auditors, who are understood to be professional men. And let it be added, that though the decree made provision for an appeal, no appeal was taken. Yet, we are asked to doubt here the soundness of this Georgia judgment, though not doubted by professional men in Georgia, having the best opportunities to know the* real meaning of the--decision in Collins’s case, with which it is supposed to conflict.
But what is the evidence of this conflict? The surmise has no better foundation than loose expressions dropped by Judge Warner, (evidently without weighing their import,) in the decision of Collins’s case; expressions not necessary to the actual facts of that ease -, and which, to make the most of them, were equivocal. To give point and tendency to judicial phrases, thus roundly and hastily uttered, we are requested to make a substantial ground out of the argument of Mr. Law, — that there was an executory agreement to mortgage, which should be regarded as executed, — when the Court, so far from intending to support his position, or make it the ground of its decision, did not notice it in its judgment.
The record of Collins’s case is now before us, and it turns out, as I conjectured in the decree, that the bills were never delivered to him, but remained the property of the bank, and under its controland were, therefore, never issued by the bank. And it appears that the distinction between that case and the subsequent one, was, as the auditors and Judge Floyd determined, that in Collins’s case the bills were held not to be issued or obligatory, because never pledged or delivered, whereas in the latter case; they were held to be issued, because they were pledged and delivered. That in .the one case, the agreement to pledge was executory, and did not pass the property in the bills, — which were, therefore, not issued, — while in the other case, the agreement was executed by an actual delivery, which passed the property in the bills, to the pledgee — and amounted, in the judgment of the Court, to an issue of them under the charter.
I have a brief remark to make here upon the expressions of Judge Warner; which will shew his real meaning, and that his observations, in relation to the fraud of supporting Collins’s claim, as against bill holders, however applicable to *355 that case, under that charter, can have no application to this case, under the charter of the Ocmulgee Bank. When I pro-1 nonneed the decree, J supposed there was a perfect analogy between the charter of the Monroe Rail Road and Banking Company, which creates a lien, for the redemption of the £ bills, upon the Rail Way and equipments, and the charter of the Ocmulgee Bank, which charges the stockholder rateably, with an obligation to redeem her issues. But there is no real analogy. In the case of the Monroe Bills, every bill was a charge on the equipments, the security provided being a common security for all of them. The bringing forward, therefore, any bill not issued, tended to adminish the amount to be received out of the security on the other bills, which were issued: and was, therefore, a fraud on them, whether their bills were taken by them as money, or not. It is different with the bills under the Ocmulgee charter. Every bill holder has a several claim against every stockholder, according to the amount of his stock, and only in that proportion : and if every bill held by Johnston were disallowed, or burned, it would neither increase nor diminish the amount to which other bill holders are entitled. The observations, therefore, of Judge Warner in relation to the interests of other bill holders, though well applied by the Judge in that case, have no place whatever in this. The material question in both cases was the fact of issue, and not the character in which the paper was received : and it is a misapprehension of Judge Warner’s observations, to apply them otherwise.
The defendants, in this case, in taking upon themselves the defence of the interests of bill holders, are assuming a task wholly gratuitous, and performing a duty no way incumbent upon them. The interests of bill holders are in no way implicated ; and, if it were otherwise, there are no bill holders before the Court, or objecting, as in Collins’s case.
Looking at the Georgia decisions, therefore, as decisive of the question whether the pledging of a bank bill amounts to an issue of it, and finding that they answer that question affirmatively ; what can we desire more? Do they not establish that the bank is bound ; and that the collateral security provided to make its obligations good, follows, as of course ? Surely if the bank is bound, the stockholders are bound, also. It was with the express view of accumulating their liability to that of the bank, that they were made liable for bills issued by her. Upon what ground are they to escape this liability? Why, upon this; that such an issue of the bills was fraudulent ! How, fraudulent ? The alledged fraud upon bill holders has been already refuted. Well, but it tended to deceive the public. If it were so, that is no objection for the stockholders to make. The principle of this objection is precisely the same with that involved in the objection of these defend** *356 ants in relation to the bank’s having proceeded to business t before it had the specie in hand, required by its charter; the futility of which I have already exposed. The business of these defendants is not to protect the public, but to perform their contracts; and the public will be much better protected by the performance of these, than by .the strongest professions of attachment to its interests, unaccompanied by the evidence of acts. But if we are to look to the public; who are the public ? Is not Johnston one of them ? These pretexts are entirely insufficient, as a defence for these stockholders. There are more persons constituting the public than the share holders of this institution. The charter was intended to protect others than the bank and its corporators. They are no part of the public, that was intended to be protected. On the contrary, the public, by the charter, is intended to be set over, in direct antagonism, against them. It is the public interest that they should be held liable. The only persons concerned in their exemption are the stockholders themselves; and to excuse themselves it is necessary for them to show,’ not that the public, but that they, themselves, have been defrauded. And how can they show this 'l Is it not true that the stockholders of every bank have it in their power to know every bill which is signed, and every bill which, after being signed goes out of the bank? It is true that, in practice, stockholders do not find it convenient to avail themselves of this power. But it exists: and they must therefore be held to know the whole extent of the issues; and cannot be allowed to say they are surprised by the amount of bills issued. Were not these bills issued? Yes. Was the bank bound? Yes. And what was it that made the issue a good issue so as to bind the bank? Was it not that, in making it, the directors were acting under the powers conferred on them by the charter? Though not the agents of the stockholders, ás individuals, were not the directors their agents, as corporators, to the extent of the powers conferred on them by the charter ? Was not the power to issue bills, one of these powers? Did not these defendants, by entering into the institution, voluntar rily assent to the charter, with all the powers vested by it in the directors? Then, finally, was the exercise of the powers thus voluntarily assented to and expressly conferred, a fraud on those conferring them ?
It is true, that in the decree, I took it for granted, that the bills in this case were to be at the disposal of the plaintiff whenever his account for advances was settled, and not paid. The contrary was not intimated in argument, so far as I can recollect. But suppose it were otherwise, if the observations I have made are entitled to weight, the security of the bills was good, though they were never to be circulated.
One reason, I apprehend, for doubting this position is, that *357 the bills would be taken to have been intended as a security only in case of the insolvency of the bank. That is, however, the only case in which the liability of the stockholders would be necessary to the perfect security of the bills, let them be issued or pledged upon any terms you can imagine. argument that these bills created a preference over other creditors, in case of insolvency, and that the issue of them was a breach of the Georgia Statute, on that subject, stated in the decree, is merely verbal. Any bill, issued under any circumstances, would serve to create such a preference, if these bills have that effect. Surely the authorizing the issuing of bills, was a legislative modification of the statute on the subject of preferences; if, indeed, as I have said, they do create a preference. But is it not manifest that the preferences intended to be inhibited were to consist of an unequal distribution of the assets of the debtor ? which debtor was, in this case, the bank. No inequality as among her creditors, whether by bills or otherwise, in the distribution of her assets, was produced by the issue of these bills: and no creditor, who was still entitled- to come in pari passu against her assets, as all creditors were, was defrauded by the circumstance that some creditor's were, as bill holders, better secured than others, by having third persons bound, also, for their debts.
5 J. B. 68. 2 Hill Ch- 651'
Another reason for the doubt is that for contracts, other than by bills, the stockholders are not bound by their charter. It has been supposed that there could not legally exist, at the same time, two obligations for the same matter: the liability of the bank by simple contract for the advances, and the superadded special liability under the charter for bills. But an example to the contrary is presented in every promissory note. And no further authority for this is needed than the case of Toby vs. Barber, cited in Wardlaw vs. Gray.
But I do not think I was in error when I considered it the true contract between the plaintiff and the bank, that was to deal with the bills as he pleased, when his advances terminated, and were not paid.
There was nothing in the interrogatories put to the witnesses calculated to draw their attention to the duration of the restraint which the agreement imposed upon the circulation of the bills pledged ; and I do not think it a fair interpretation of their testimony to give emphasis to any expression loosely made by them which may import that the restraint was perpetual. One witness, and only one, I believe, does say that the plaintiff was never to circulate the bills. The others say simply he was not to circulate them. If this were an important distinction, its having escaped both the Chancellor and the counsel, is some evidence that it may not have been perceived by the witnesses ; and before overruling *358 a decision upon a matter of fact, and where the subject is of the value of $50,000, it appears to me that this matter should ' be left open, and the judgment reserved, and given only upon furtper enquiry allowing the witnesses to be-re-examined.
Allen Plem-P- j lnt-
But whether .what the one witness says, or what the others say, ]3e n0w taken as evidence: whether the words of the agreement were that the plaintiff was not to circulate, or never to circulate, the bills : is it not a very narrow interpretation of them, not to apply them to the subject matter of the contract, the debt for which the bills were given as collateral; but to leave the subject entirely out of consideration ? If such a loose contract as this were before a Court for construction, would not the end and object of the agreement be considered, and the agreement, be interpreted in reference.to its subject matter? And would not the natural, p rima facie interpretation be that the bills weré not to be circulated, or never circulated, until the advances were ended-, and there was a failure to satisfy them?
But why resort, orí behalf of the Rail Road-Bank, to a very critical scrutiny on this subject, when the téstimony shews there was a receipt given by the plaintiff to them, setting forth the precise terms upon which he received the bills ? Why n0{; this receipt produced! If the contract restraining t[,e circulation is not ended,, the bank must have held this receipt when these stockholders took possession of if. If it was ended,, the bills then became liable to Johnston’s absolute control: and by the interpretation on all hands of the second Georgia decision, he was a bill holder.-
That the restraint, whatever it was, was ended, seems extremely probable from the bank’s having settled his account, and carried the balance to his credit as cash, subject to his demand, on the personal ledger. I think that though he did carry out the bills after this settlement, he did not take them in payment, but his possession of them was continued as collateral security for the debt settled and freed from all restraint. That debt was never paid.
But apart from these considerations, and assuming, now, that the contract was, that the bills should never be passed off :■ was it not, alsój a part of that contract that the principal debt should be paid ? If no time was previously fixed, by bond or otherwise, for its payment, was not that effectually done when the account was settled, and the amount de-dared then payable ? Was that contract for its payment ever fulfilled? And when the bank broke her part of the agreement, was Johnston still bound by his? Was he not then put at liberty to sue, or circulate the bills, according to his interest or pleasure ? And, as to these defendants, are they entitled to the full benefit of the most literal fulfilment of the pledgee’s agreement, when, by their own interference, *359 they destroyed all hope of the performance of the counter stipulation — which constituted the consideration for its per-v formance 1
I here conclude my review of the case of the plaintiff.
I abstain from all remark upon the justice of his claims ; i of its being known to these defendants that the advances were being made, for their benefit, upon the faith of the collateral security ; and suffering the advances to proceed without a word of disapprobation, when a single word might have saved him. I say nothing of the steps taken to ward off the liability and defeat the claims. But in closing my observations on this painful subject, I must be allowed to declare, that in my opinion, this suit presents one of the strongest appeals ever exhibited on our records, for a firm and inflexible judicial interposition to put down fraud, and to discountenance trick and chicanery: and, if this appeal be not heard, if the defence in this case succeeds, justice will have lost much of its sanctity, and a sense of its obligations will be in danger of being greatly impaired among us! And public policy, the theme of the defence, will have irreparably suffered.
Richardson, J. — concurred.

Note. — The fraudulent transfers, in the case at bar, having been made almost entirely in consideration of a pre-existing debt, it would seem that the doctrine here advanced, would confine the Rail Road Bant to a demand to have back, at all events, no more than the money she advanced at the time of the transfer. The debts, satisfied by the transfer, would require to be set up again and revived; which active interposition a party convicted of fraitd, has no equity to claim.