1815.

Boyd
v.
Dunlap.

---

*July* 14th.

BOYD & SUYDAM *against* DUNLAP AND OTHERS.

Where a deed is sought to be set aside, as voluntary and fraudulent against creditors, and there is not sufficient evidence of fraud to induce the court to avoid it absolutely, but suspicious circumstances as to the adequacy of the consideration, and fairness of the transaction, the court will not set aside the conveyance altogether, but permit it to stand as security for the sum actually paid.

And where the plaintiff was a purchaser at a sheriff's sale, under a judgment, the court gave the defendant his election to pay the amount of the judgment, interest, and costs, and take a conveyance from the plaintiff: or, in default, to deliver up the deed to be cancelled, on receiving from the plaintiff the sum actually advanced by the defendant.

THE plaintiffs recovered four judgments against *W. Dunlap*, the elder, and *James Gardner*, defendants, on four promissory notes, made in *May*, 1811. Executions were issued, in *May*, 1812, on the judgments, amounting to 1,137

dollars and 37 cents; and the sheriff having levied on the supposed real and personal estate of *W. Dunlap*, his son, *W. Dunlap*, jun., interposed a claim to the personal property, by virtue of a bill of sale, dated the 30th of *May*, 1811, for the consideration of 348 dollars, and to the real estate by virtue of a deed, dated the 24th of *December*, 1810, from his father, *W. Dunlap*, for the consideration of 1,500 dollars. The bill of sale of the personal chattels had a schedule of the articles annexed, with the value of each, consisting of necessary household furniture, and the names of two witnesses subscribed. A jury of inquiry, summoned by the sheriff, having found the title to the personal property to be in *W. Dunlap*, jun., it was restored to him. The real estate was sold by the sheriff, and purchased by an agent of the plaintiffs, who received a deed from the sheriff, and, on the 16th of *October*, 1812, conveyed the property to the plaintiffs.

The plaintiffs alleged the bill of sale of the personal property, and the deed of the real estate from *William Dunlap*, to his son, *W. Dunlap*, jun., to be voluntary, and without consideration, and made fraudulently, to defeat the creditors of *W. Dunlap*, the elder; and they prayed that the defendants might produce the deeds, and discover the *time* of their execution, and the consideration, if any, and that they might be set aside as fraudulent.

*W. Dunlap*, and *W. Dunlap*, jun., in their answer, admitted the facts stated in the bill, as to the judgments, executions, sheriff's sale, &c. but denied that the bill of sale and deed, between them, were without consideration, or fraudulent. *W. Dunlap*, jun., stated, that on the 3d of *September*, 1804, he agreed to work for his father, as a journeyman saddler, for 18 dollars per month, and continued to work for him until the 5th of *May*, 1808, during all which time he did not receive one fourth of his wages, and there was due to him for wages, 583 dollars; that, during the years 1808, 1809, and 1810, he advanced 700 dollars, for repairing and finishing

the house, and erecting buildings on the premises in question; and, in 1805, he paid 78 dollars in part consideration for the land; that, in *August*, 1810, his father agreed with him, that if he would move on the premises, and erect some additional buildings, he should have a deed for the premises; that, accordingly, in the autumn of 1810, he went on the premises, and erected additional buildings, and his father, *December* 24th, 1810, executed to him the deed in question; that he, afterwards, assumed several debts owing by his father, to *Root & Davison*, and to *Walton & Co.*, amounting to about 310 dollars, and for which, he said, his father gave him the bill of sale of the personal chattels.

It was proved that the value of the real property, in *December*, 1810, was 1,700 dollars, and that it was now worth about 2,500 dollars; that *W. Dunlap*, the younger, had always lived with his father, and worked at his trade, being now thirty years of age. The father erected the dwelling house and saddler's shop, prior to 1810, and the son, afterwards, built the painter's shop, and repaired the barn. Father and son both lived together in *May*, 1812, as they had done before. The son purchased of one *M'Claw* an addition to the lot, for which he paid 75 dollars. The son was considered, in the family, and by others, as the owner of the property, and had the principal management of the business. *Walton*, a witness, stated, that, in *February*, 1812, *W. Dunlap*, the elder, owed *Walton & Co.* 110 dollars, and the son presented his father's account for 102 dollars, and paid eight dollars, the balance. *Root*, a witness, stated, that the account with him and with *Root & Davison*, was kept in the name of *W. Dunlap*, the elder, to whom he supposed the son to be an agent; that the father gave a note for the balance due, prior to *March*, 1812, of about 400 dollars, which was put in the bank and paid; that, from *March*, 1812, to *August*, 1814, the goods charged to the father amounted to about 1,325 dollars, part of which still remained unpaid.

It was testified by *Thomas Dunlap*, a brother of *W. Dun-lap*, jun., that when the latter came of age, his father offered him all his property, if he would stay with him, and take care of his parents in their old age. That when it was known that his father had become surety for one *Adair*, who failed, the son insisted on a conveyance, according to the old contract, which was done. He had never seen the deed, but believed it was executed before *May*, 1812.

*Leslie*, a witness, stated, that, in 1811, or 1812, *Gardner*, the defendant, said, that he and *W. Dunlap*, the elder, had endorsed a note drawn by *Charles Adair*, for about 900 dollars, which was passed to the plaintiffs; and which, when due, was renewed by the four several notes on which the judgments were obtained. *Shurtleff*, a witness, also stated, that he drew a deed from the father to the son, some years ago, which was executed in his presence, prior, as he believed, to *December*, 1810; and he understood, from both parties, that it was to satisfy a debt, and in pursuance of a previous agreement, in consequence of which the son had repaired the house, and built, &c.

*H. Bleecker*, for the plaintiffs.

*S. A. Foote*, for the defendants.

THE CHANCELLOR. The bill seeks for discovery and relief, on the ground of fraud, against a deed of land, and a bill of sale of chattels, alleged to have been given by the elder to the younger *Dunlap*. The plaintiffs appear in the character of creditors, and the younger *Dunlap* sets up a title as purchaser from the debtor. I do not discover, from a view of the pleadings and proofs, such traces of actual and direct fraud, as to feel myself warranted in directing the conveyance of the real estate to be delivered up and cancelled, as absolutely null and void. There is a marked

difference between an interference actively to compel a party to reconvey or surrender a deed, and a refusal to aid a party who seeks a specific performance of a contract. If actual fraud be not clearly and satisfactorily made out, the court may refuse its aid, but will not take so decisive a step as setting aside, *in toto*, the assumed title ; but will either make it subservient to the equity of the case, or leave the party complaining to his remedy at law against a contract founded on inadequacy of price, or other suspicious circumstances. (*Young* v. *Clerk, Prec. in Chan.* 538. *Griffith* v. *Spralley*, 2 *Bro.* 179. n. *Day* v. *Newman*, cited in *Newland on Cont.* 66.)

The only question with me has been, whether the plaintiffs ought to be left to their legal remedy, or whether the case affords sufficient ground for a limited interference, by allowing the deed of the real estate to stand as a security only for such consideration as has been shown by the younger *Dunlap*. There appears to be very considerable inadequacy of price, even admitting the consideration expressed in the deed , and to allow the deed to stand as security only for the true sum due, would be doing justice to the parties, and granting a relief which cannot be afforded at law. A court of law can hold no middle course. The entire claim of each party must rest and be determined, at law, on the single point of the validity of the deed ; but it is an ordinary case in this court, that a deed, though not absolutely void, yet, if obtained under unequitable circumstances, should stand only as a security for the sum really due. (*Proof* v. *Hines, Cases temp. Talb.* 111. *Grove* v. *Watt*, 2 *Schoale & Lefroy*, 492.) A deed, fraudulent in fact, is absolutely void, and is not permitted to stand as a security for any purpose of reimbursement or indemnity ; but it is otherwise with a deed obtained under suspicious or unequitable circumstances, or which is only constructively fraudulent. (*Sands* v. *Codwise*, 4 *Johns. Rep.* 536. 598, 599. Lord *Eldon*, in 8 *Ves.* 283.) In *Herne* v. *Meeres*, (1 *Vern.* 465. 2 *Bro.*

177. n. S. C.,) this last rule of equity is applied to a case like the present. A purchase at a great under value, and with other ill circumstances along with it, was set aside on terms, in favour of creditors. The Lord Chancellor observed, that, at law, where a conveyance was found to be fraudulent, the creditor comes in and avoids all, without repayment of any consideration money; but, in equity, where the court can decree back the principal and interest, *there is no hurt done, and a lesser matter, in such a case, will serve to set a conveyance aside;* and he, accordingly, decreed the purchaser to reconvey, upon payment of the consideration, with interest. The same principle is discoverable in the decision in *Bennet* v. *Musgrove,* (2 *Ves.* 51.,) though the case is imperfectly, or badly reported. A deed, with a small consideration, was set aside in favour of a creditor, on the ground of fraud, *so far* as to let in his debt; and Lord *Hardwicke* observed, that the creditor was entitled to his remedy there, whether he could or could not have set aside the deed in an action at law. So, again, in *How* v. *Weldon,* (2 *Ves.* 516.,) a fraudulent deed was permitted to stand as a security only for the sum really advanced. Nothing can be more equitable than this mode of dealing with these conveyances, of such indecisive and dubious aspect, that they cannot either be entirely suppressed, or entirely supported, with satisfaction and safety.

Neither of the deeds have been regularly proved and made *exhibits* in the cause, though they were produced on the hearing. This is alleged to have arisen from inadvertence; and a motion has been made to enlarge publication, for the purpose of proving, formally, the execution of the deeds. Liberty to re-examine witnesses rests in discretion, and is to be governed by circumstances. This is the general rule; (*Wyatt's P. R.* 420. 2 *Ves.* 270. *Amb.* 585.;) but, from the view I have taken of the case, this measure need not be resorted to. There is very considerable proof (though not the most direct) of the execution of the deeds

prior to the judgments. If, in fact, they were not so exe-cuted, the plaintiffs need not have come here, and they are at liberty to pursue their full and perfect remedy at law, by ejectment founded on the sheriff's deed. But assuming the conveyance of the land to have been executed at its date, as the answer alleges, and which fact appears pretty evident-ly from the testimony of *Shurtleff*, one of the subscribing witnesses, then the question occurs, to what extent can re-lief be afforded against it ?

The circumstances of the case are extremely unfavoura-ble to the fairness of the transaction; and to give the con-veyance absolute validity would be attended with the utmost danger to the rights of property. The very diminished control which the creditor now has over the person of the debtor, greatly enfeebles the common law remedy of impri-sonment, as a means of coercion to justice ; and it becomes important to guard, with increased anxiety, against every possible contrivance to cover or withdraw property from the payment of debts. The bill of sale of the household fur-niture I consider as absolutely void. The defendants have not made out, in proof, any consideration on which it rested when it was made, and the fact of the articles being house-hold goods, and continuing in the same possession after, as before the sale, is decisive against its validity. Lord *El-lenborough* ruled, in the case of *Wordall* v. *Smith*, (1 *Campbell's N. P.* 332.,) that a concurrent possession with the assignor was colourable, and that there must be an ex-clusive possession under the assignment, or it is fraudulent and void as against creditors : and the inducements to the conveyance of the land seem not to have been altogether pure. When the elder *Dunlap* endorsed the notes upon which the judgments were obtained, it was, no doubt, done with the knowledge of the son, and the endorsement was ac-cepted by the creditor, under the presumption (no doubt) that he was the owner of the real and personal estate of which he was then the visible possessor, and had been for

many years the actual owner. The son was brought up in his father's family, and taught his trade, and he continued to reside and work with his father until the age of thirty, and, in the eye of the public, the father's possession of the real and personal estate remained unchanged. He continued to receive the credit due to the owner of the property, and the son took no step, long after the date of the deed, to prevent the public from resting on a misplaced confidence in the soundness of that credit. He permitted the accounts with merchants, as with *Walton*, and *Root & Davidson*, to continue to stand and accumulate in his father's name, and upon the exclusive credit of his father, long after the alleged existence of the transfer of the estate to him. All the witnesses concur in the fact, that the father and son continued to reside together, down to the time of issuing the executions, in the same manner as they had always lived when the son was an avowed apprentice, or journeyman, and boarded with his father. In addition to all this, the deeds were never exhibited, by proof or registry, or otherwise made known to the public ; but it was a family transaction, very reservedly conducted, and attended with the continuance of the same exclusive, or at least mixed, possession. But the circumstance that weighs most strongly against the good faith and purity of the motives of the parties, is the fact that the debt of the plaintiffs existed against the father *before* the date of the conveyance. This appears clearly from the testimony of *Walton* and *Leslie*, and *Thomas Dunlap*. *Adair* was the person for whom the father was surety for the very debt from which the judgments originated ; and when *Adair* failed, the father complained that it was hard for him to pay the debt, as *Adair* had deceived him, and that he had offered to pay half of it ; but, as *Gardner* had refused the proposition, he would not pay. And during the time of this repugnance in the elder *Dunlap* to pay, the son insisted upon the conveyance of the estate to him. It may be that this was done to give the son the preference as a

1815.

BOYD
v.
DUNLAP.

*bona fide* creditor, but when so many inauspicious circum-stances occur, the claims of the son ought to be established with very great precision and certainty.   He is not entitled to the indulgence of much presumption in his favour.

The claim of the son, at the date of the deed, consisted of arrears of wages as a journeyman, and of expenditures upon the land.

1. His wages for three years and eight months, according to his answer, did not exceed 583 dollars.   The fact of his working for that period, after he was of age, and the reasona-bleness of the charge at 18 dollars a month, exclusive of boarding, is sufficiently supported by proof.

2. The charge of repairing the buildings on the lot, prior to the summer of 1810, is unsupported by proof.   There is no evidence of actual payments, nor any *data* by which any can be computed.   The testimony, on this point, is perfectly vague ; and indeed one of the witnesses, (*Tayler,*) who worked in the shop, says, that the buildings, prior to 1810, were erected by the father ; and when we consider that the son, who had been in partnership with that same witness, had stock to the amount of 1,200 dollars, which, in 1810, he carried to *Canada,* there is no reason to presume any con-siderable previous expenditure on his father's account.   It was incumbent on him to have established the fact, and he has totally failed.   But there is no doubt that the son built the painter's shop, on the premises, in the autumn of 1810. All the witnesses concur in this fact ; and for that improve-ment he ought to be refunded.   It was, doubtless, done under the promise and expectation of a deed ; and the land may be considered as an equitable pledge for his reimburse-ment.   The only difficulty is in ascertaining the amount of that expenditure.   *Holland* was the carpenter whom he employed to build the shop ; and he says " the probable expense was about 300 dollars."   This testimony is not sufficiently precise, but it is the best that this case has afforded.

There was, likewise, the sum of 75 dollars, which the younger *Dunlap* paid for the purchase of a small addition to the lot from *L. Claw*; and, if we deduct from these charges, the amount of the goods and chattels which he has wrongfully received, and which were not sold by the sheriff, and are enumerated in the bill of sale, and there valued at 348 dollars, the account will stand thus :

| | |
|---|---|
| Wages due | $583 |
| Erecting shop | 800 |
| Paid *L. Claw* | 75 |
| | $1,458 |
| Credit on the bill of sale | 348 |
| | $1,110 |

This sum of 1,110 dollars is the utmost for which I can, or ought to, permit the deed to stand as a security.

I shall, accordingly, allow to the defendant, *William Dunlap*, jun., his election, to pay, within 30 days from notice to his solicitor of this decree, the amount of the judgments upon the four notes mentioned in the bill, together with interest thereon, and the taxable costs of the plaintiffs, at law, and in this court; and that the plaintiffs shall, thereupon, convey to him, in fee, the premises mentioned in the deed of the 24th of *December*, 1810, and deliver into his possession the deeds of their title from the sheriff. But in default of such payment, or tender, that the defendant shall, within 30 days thereafter, convey the premises, in fee, to the plaintiffs; and, at the same time, deliver into their possession the deed of the 24th of *December*, 1810, without being chargeable with any previous rents and profits, on condition of a previous payment, or tender, to him, by the plaintiffs, of the sum of 1,110 dollars; and, in that case, neither party shall

have costs as against the other. And if neither alternative be complied with, as aforesaid, that then the bill in this cause shall stand dismissed without costs.

Decree accordingly.