## John E. Robinson v. Mina Boyd, Andrew G. Wiggins and Hiram C. Hodge.

*Insolvent debtor: Sale of property: Fraud upon creditors.* A person who takes title from an insolvent debtor merely for the purpose of defrauding creditors, and disposes of it on credit, is liable to them for its value, whether he succeeds or not in collecting the purchase money, and a decree charging him with the price thus obtained is correct.

*Judgment Creditor: Fraudulent Conveyance.* When and how a judgment-creditor will be entitled to relief against an execution-debtor, who makes a fraudulent conveyance of property, discussed.

*Heard May 13th.    Decided June 2d.*

Appeal in Chancery from Clinton Circuit.

This was a creditor's bill filed by complainant against Boyd & Wiggins, and one Hodge, to compel said Hodge to account to complainant for the proceeds of a re-sale of certain real and personal property, which, it is alleged, was fraudulently sold by Boyd & Wiggins to Hodge with intent to defraud their creditors.

The bill was taken as confessed by defendants, Boyd & Wiggins, and heard on pleadings and proofs as to defendant, Hodge. A decree was entered for complainant, and from which Hodge appeals.

*Spaulding & Cranson,* for complainant.

*G. V. N. Lothrop,* for defendant.

GRAVES J.

The bill in this case alleges that on the 20th day of October, 1865, the complainant obtained judgment against the defendants, Boyd & Wiggins, in the Circuit Court, for the County of Clinton, upon contract for two thousand and eighteen dollars and ninety cents damages, and costs; that on the second day of December following, an execution was issued thereon, and delivered to the Sheriff of said County of Clinton, and made returnable on the sixth day of February thereafter; that said execution, on the return day thereof, was returned wholly unsatisfied for want of property

belonging to the defendants within the county, and that the judgment remains in force.    It is further alleged among other things, upon information and belief, that the defendants, Boyd & Wiggins, had lately sold to the defendant, Hodge, the east half of lots 11 and 12, in block 7, in the village of St. Johns, in said county, and the livery stable, with the horses, carriages, harnesses and other things connected therewith, lately belonging to said Boyd & Wiggins, with the intent to defraud complainant and prevent his collection of said judgment; and that such sale was fraudulent, and made for the purpose of defrauding complainant and other creditors of said Boyd & Wiggins; that immediately after said Boyd & Wiggins learned that the said execution was in the hands of the sheriff, they called upon one Timothy Baker, the agent of said Hodge, and proposed to him to sell said property, real and personal, unto said Hodge for the amount of the liens then upon it, and being about $2,400; that said Baker assented, and that thereupon said Boyd & Wiggins conveyed said property accordingly; and that immediately thereafter, the said Baker, as agent of said Hodge, sold the same property to one W. C. Wolverton for thirty-six hundred and fifty dollars; the said Boyd & Wiggins being present and advising such sale, and consenting thereto.    It is further alleged, upon information and belief, that Hodge was to pay Boyd & Wiggins the amount of said purchase price, less the lien and expenses of sale. The bill prays that the sale to Hodge be declared void, and that Hodge be ordered to pay to complainant the amount received by the former, from Wolverton, less the liens then existing; such amount being in the hands of said Hodge, as complainant was informed and believed.    An answer on oath was waived.    The defendants, Boyd & Wiggins, permitted the bill to be taken as confessed by them, but the defendant, Hodge, answered.

By his answer, Hodge admits that he purchased through his agent, Baker, and states that the amount paid was the

liens then existing upon the property, together with his claim against Boyd & Wiggins amounting in the aggregate to about twenty - five hundred dollars, and that he had no knowledge of complainant's claim. The defendant, Hodge, further states, on information and belief, that at the time of his purchase the property was in imminent danger of being sold on execution to satisfy judgments against Boyd & Wiggins; that before and long after complainant obtained his judgment, he, Hodge, held a valid claim against Boyd & Wiggins for about $1,185, and made the purchase and assumed all the liabilities then existing as a lien on the property for the sole and only purpose of paying such liens and securing his own demand; that Boyd & Wiggins were unable to make a sale at the time to any other person or persons for enough down to liquidate or pay off the liens then existing; that he, Hodge, had reason to believe then, and now believes, that if he had not purchased, the property would have been sold on execution or mortgage, or both, for a sum much less than that paid by him, and thereby subjecting him to the loss of his claim; that the price paid by defendant was just and equitable, and all that the property was worth in the market at the time, and more than it would have brought in cash. The sale to Wolverton is admitted, but all interest by Boyd & Wiggins in that transaction is denied, and the purchase of Hodge from Boyd & Wiggins is alleged to have been absolute and without qualification or condition.

The recovery of the judgment by complainant, and the issuing and return of execution, as set forth in the bill, were admitted.

The sum of the demands forming the alleged consideration for the sale from Boyd & Wiggins to Hodge was $2510.16; and this was made up of the following items:

Mortgage to Steele on real estate for . . . . . . $468 38
Mortgage to Wick on real estate for . . . . . . 428 00
Mortgage to Hodge on real estate for . . . . . 448 60
Two liens by attachment subsequent to the Mortgages for . . . . . . . . . . . . . . . . 428 18
Chattel mortgage to Hodge on the personal property, . . . . . . . . . . . . . . . . . . 737 00

According to the proofs Hodge was to take the property subject to the liens, and surrender his own demands. He was to pay nothing except in so far as payment should be involved in the extinguishment of his own claims.

The sale to Hodge was made about the 27th of January, 1866, and the first conversation on the subject must have been had within a very few days before that. Hodge, and his agent, Baker, both testify that they knew that executions against Boyd and Wiggins were in the hands of the sheriff, and that a sale of the property thereon at a sacrifice was apprehended. Boyd and Wiggins were fully aware of the fact that such executions, including that of complainant, were in the sheriff's hands for service. They were very solicitous to sell, and had been for some time, and had offered the property to several; but on all occasions had absolutely refused to take less than $3,500, except from Hodge. It does not appear that any one, besides Hodge and his agent, were in any way informed or led to believe that the property could be obtained for less than $3,500 in cash; on the other hand, the testimony tends strongly to show that other parties would have readily paid a much larger sum than that alleged to have formed the consideration of Hodge's purchase, though it had involved a sufficient payment down to cancel the demands extinguished by Hodge.

The desire of other parties to make the purchase was well known to Boyd and Wiggins, and Hodge's agent could not have been ignorant of it; but the testimony very clearly shows a measurable indifference, if nothing more, by the former, on the subject of a sale to any person but Hodge, and a warm partiality for a trade with the latter.

Indeed, both Wolverton and Dayton seem to have supposed that negotiations were actually going on between them, and Boyd and Wiggins for the purchase of the property at a sum above $3,500, at the very time of the conclusion of the trade between Hodge and the latter; and the

proofs necessitate the inference that both Dayton and Wolverton were kept in ignorance of the state of the negotiation with Hodge, and the terms of it, and of the circumstance that Boyd and Wiggins regarded the negotiation with them as given up.

The bargain with Hodge being consummated on the 27th of January, the latter surrendered his claim of $737 on the personal property, and took the real and personal estate without discharging any of the liens upon it, except that covering the claim last mentioned.

He then employed Boyd at fifty dollars per month to take charge of the property.

Wolverton, believing that the negotiation between himself and Boyd and Wiggins was still in progress, and approaching consummation, in a purchase by him for more than $3,500, called again on Boyd on the 1st day of February, and only four days after the purchase by Hodge, but was then informed by Boyd of the sale to Hodge, and was referred to the agent Baker, as the person who would make the sale to him, Wolverton.

The latter thereupon called on Baker in order to effectuate the bargain which he had sometime sought; and although it appeared that Hodge had not purchased with the view of carrying on the livery business, and that in his circumstances he could not carry it on except under disadvantage, and did not intend to keep the property, but was anxious to sell it; nevertheless, it could not be purchased by Wolverton for less than $3,650, with $400 down. This was but four days after the purchase by Hodge, and while the liens on the real estate remained undischarged, Wolverton was obliged to take the real estate subject to the incumbrances to be considered as part of the purchase price. Hodge gave up the securities he held for the $737, and this was the sole act of his in the nature of a payment down. Wolverton paid $400 in cash. The difference between the alleged consideration for the sale to Hodge on the 27th of

January, and the consideration for the sale by him to Wolverton, four days after, was $1,139.84. The defendants now claim that the whole property was not worth over from $2,000 to $2,600, although they would not dispose of it, except as between themselves, for less than $3,650. The complainant claims that it was worth the latter sum. It was much sought for at that price. It was sold for that. The opinion of the parties, as shown by their conduct, favored the same view. The character and quantity of the property justify the belief that Wolverton did not exaggerate its value. In either view of the value, the difference in the sale price in some four days was a large one; and the circumstances wholly fail to account for such difference upon any hypothesis consistent with the claims of good faith. The statements in the answer are unsatisfactory. The claim of $737 was already secured by chattel mortgage on the whole personal property: no private purchase of the equity of redemption was called for, or appropriate to protect the interest of the mortgagee under such mortgage, against the action of subsequent execution creditors. The other demand of Hodge was secured by mortgage on the real estate, and certainly the position of that lien relatively to others, whether by mortgage, attachment or execution, could not be changed by the acquisition of the equity of redemption, nor could it be impaired by the action of subsequent execution creditors. Hence, the alleged necessity for the purchase by Hodge, in order to protect his interests, does not appear to have existed. According to the evidence the legal title to the whole property was transferred to him upon the bare surrender of the chattel mortgage for $737, and, as a consequence, he acquired, without consideration, the right to appropriate to his own use, or hold by secret trust for Boyd and Wiggins, whatever could be obtained for the equity of redemption in the whole real and personal property. Wolverton was at the time endeavoring to buy that equity for between eleven and

twelve hundred dollars, and, as already stated, neither Boyd and Wiggins or Hodge were willing to sell it for less than that. No doubt can be entertained, but that it was worth the sum for which it was sold, and, to that extent, I think the conveyance to Hodge was wholly voluntary, as against the creditors of Boyd and Wiggins.—*Boyd v. Dunlap, 1 Johns. Ch. 478; Mohawk Bank v. Atwater, 2 Paige, 54; Wickes v. Clarke, 8 Id. 161, 172; Wright and Cook v. Stanard, 2 Brock. 312–314; Hopkirk v. Randolph, Id. 133, 150.*

Under these circumstances, was the complainant entitled to the relief he asked? I think that he was. By the management of the defendants, an amount of property belonging to the execution debtors, worth between eleven and twelve hundred dollars, was actually transferred to Hodge, for no apparent consideration whatever, and was immediately transferred, by the latter, to an innocent purchaser, upon terms satisfactory to Hodge. When the latter sold to Wolverton he exercised his own discretion as to payment and security, and was content to take what he received, in place of the property for which he had paid nothing.

If, on parting with the property thus obtained from Boyd and Wiggins, he received insufficient security, the risk or loss should fall upon him, and not upon the other creditors, who by his means were cut off from all opportunity to reach the property itself. Whether he made an imprudent sale, or took insufficient security, or made a gratuitous disposition of the property, he ought not to be allowed to say that he is only chargeable with what he may have actually received from Wolverton.

Having obtained the equity of redemption without consideration, and having placed it beyond the reach of the complainant, and having failed to make any explanation which would enable the court to grant relief in any other manner, I think he should be personally charged with the value of the property so obtained. As already stated, such value is sufficiently shown by the conduct of the defendants,

the efforts of third persons to purchase, and the actual sale to Wolverton.

As the decree below placed the value of the property so obtained without consideration at the same sum, I think it ought to be affirmed, with costs.

COOLEY CH. J. and CAMPBELL J. concurred.

CHRISTIANCY J. did not sit.