Muirheid v. Smith.

CHARLES H. MUIRHEID and WILLIAM H. MUIRHEID, appellants,

v.

CHARLES E. SMITH, respondent.

1. In 1866, oné M. died seized of a farm of about two hundred acres, leaving a widow and several children. One son, Charles, purchased the interests of his brothers and sisters in the farm, and. agreed with one of his brothers, William, that William should remain on and take charge of the farm, and maintain their mother and unmarried sister thereon, from the products of the farm, promising to compensate William for his services, and to convey the farm to him whenéver he wished, or could pay for it. The mother remained until her death in 1872, and the sister still resides there, and Charles has spent one or two months of every summer on the farm, with his own family. In March, 1877, he conveyed the farm to William, together with the implements and stock thereon, for a consideration, named in the deed, of $12,000, for which sum William gave a mortgage on the farm to Charles. In June, 1877, the amount of this mortgage was reduced by crediting thereon a mortgage of $2,000, which Charles had given to William in 1866 for his interest in the farm, by $2,000 which Charles allowed William for his services on the farm, and by reducing the valuation of the farm from $12,000 to $10,000—leaving the sum secured by the mortgage, $6,000. In April, 1877, the complainant began a suit in Pennsylvania on Charles's note, in which he recovered a judgment for $18,000. Charles was insolvent when the farm was transferred, but this was unknown to William. *Held*, that the conveyance was good as against the complainant, and the adequacy and fairness of the consideration, and the *bona fides* of William having been established, the land cannot be deemed as a mere security for the original debt, besides the mortgage for $6,000 due from Charles to William, and consequently be charged therewith, but the transfer being sustained, the bill to set it aside as fraudulent must be dismissed.

2. To set aside and completely annul a deed made to a grantee who is a creditor, or who has given a consideration for the conveyance, which shall carry with it a forfeiture of all the grantee's rights, on the ground that the conveyance was made in fraud of creditors, it is necessary that it should appear that the grantee had knowledge of, or participated in the fraudulent intent of the grantor.—DEPUE, J.

3. Where a deed is sought to be set aside as voluntary and fraudulent, as against creditors, and the evidence is not sufficient to induce the court to avoid the deed absolutely on the ground of fraud, but is sufficient to excite a

Muirheid *v.* Smith.

well-grounded suspicion as to the adequacy of the consideration and the fairness of the transaction, the court will permit the conveyance to stand only as security for the consideration actually paid.—DEPUE, J.

On appeal from a decree of the chancellor, whose opinion is reported in *Smith* v. *Muirheid, 7 Stew. Eq. 4.*

*Mr. A. G. Richey* and *Mr. James Wilson,* for appellants, cited :

*Clark* v. *White, 12 Pet. 178; Beatty* v. *Fishel, 100 Mass. 449; Vanderveer's Will, 5 C. E. Gr. 463; Magniac* v. *Thompson, 7 Pet. 347; Kline* v. *Horine, 47 Ill. 430; Merchants Bank* v. *Northrup, 7 C. E. Gr. 58; Atwood* v. *Impson, 5 C. E. Gr. 151; Hildreth* v. *Sands, 14 Johns. 493; Bedell* v. *Chase, 34 N. Y. 386; Wood* v. *Shaw, 29 Ill. 444; Wilson* v. *Lott, 5 Fla. 305; Boyd* v. *Dunlap, 1 Johns. Ch. 478; Demarest* v. *Terhune, 3 C. E. Gr. 532; Libby* v. *Hood, 3 Mo. 206; Seymour* v. *Nelson, 19 N. Y. 417.*

*Mr. Barker Gummere,* for respondent, cited :

*Demarest* v. *Terhune, 3 C. E. Gr. 533, 534; Randall* v. *Vroom, 3 Stew. Eq. 355; Miller* v. *Sauerbier, 3 Stew. Eq. 73, 74; Claflin* v. *Mess, 3 Stew. Eq. 212; Poague* v. *Boyce, 6 J. J. Marsh. 70; Lynde* v. *McGregor, 13 Allen 213; Hartman* v. *Diller, 62 Pa. St. 37; Pettibone* v. *Stevens, 5 Conn. 19.*

The opinion of the court was delivered by

KNAPP, J.

The bill is filed by Smith as a creditor of Charles H. Muirheid, sought in aid of an attachment sued out by Smith against Muirheid, to annul a conveyance of lands made by the debtor to his brother, William H. Muirheid, upon the ground that the transfer was made in fraud of creditors. The cause was heard upon bill, answer and proofs, by the chancellor, who, by his decree, holds the conveyance void for fraud.

The principles involved in the litigation are settled and

familiar, and are not subjected to controversy.   It is their application to the case made, which is questioned in this appeal.

The bill calls for answer not under oath, and defendants both answered, denying the fraud alleged in the bill.   The proof taken was entered upon the part of the complainants, William H. Muirheid being examined upon the complainants calling him upon the stand.

It appears from the case that the father of the defendants died intestate, in 1866, seized of a farm of about two hundred acres, at Hopewell, in Mercer county, leaving a widow and seven children and the child of a deceased daughter, his heirs-at-law. Charles being possessed of means, and engaged elsewhere in profitable employment, desired to retain the premises as a home for the family, and especially for his mother and maiden sister, and purchased from the other heirs their shares in the father's property.   He arranged with William, his younger brother, to remain in charge of the farm, and to cultivate it for the family subsistence, promising William to compensate him for this service, and to convey the farm to him whenever he desired, or should be able to purchase it.   William devoted himself to the management of the farm and the care of the family for a period of ten years.   His mother remained with him until her death in December, 1872, and the sister has had her home with him from the time when the arrangement was made until the present.   To this family home, Charles also came each year with his family, remaining from one to two months.   In March, 1877, Charles sent an executed deed, dated the 16th of that month, to a scrivener at Pennington, conveying to William the farm, with the stock and farming implements thereon belonging to Charles, naming in the deed $12,000 as the consideration, and directed the draft of a mortgage upon the farm from William to him for that amount.   The deed was delivered to William, and the mortgage executed and returned by the scrivener to Charles. No meeting of the parties took place immediately before or at the time of the transfer.   At this time William held the bond and mortgage of Charles for $2,000, the purchase-money on the sale of William's interest as tenant in common in these lands,

20

and was, or claimed to be, Charles's creditor for the value of his past services as manager of the homestead. In June following the date of the deed, the parties met at Philadelphia, and settled and adjusted the claims of William by credits upon the purchase-money mortgage, reducing it to a balance of $6,000. William objected to the price stated in the deed for the farm and other property conveyed, claiming that $10,000 was the fair value. To this, Charles acceded, and reduced the price to that amount. The mortgage of Charles was paid by a further credit of $2,000, and for the ten years' services in the management of the farm, $200 a year was agreed upon as a compensation. For the balance of the mortgage outstanding against William, he has since paid the interest.

The complainant below held the promissory note of Charles H. Muirheid, at the time the property was conveyed, for a large sum of money then three years overdue, upon which suit was commenced in April, 1877, in Philadelphia, resulting in a judgment of over $18,000. In February, 1879, these lands were attached as the property of Charles for that debt. We may assume that the averment in the bill of the insolvency of Charles at the time, not denied in the answer, is true. But, if true, and William was aware of it, which does not appear, it is not denied that a creditor may purchase from his debtor, although insolvent, to protect his debt, if the purchase be made in good faith, and at a fair valuation. To maintain the decree of the court below, it must appear that the transfer in question was made with the intent of the parties to it to delay, hinder or defraud creditors ; or, if not actually fraudulent, a purchase from a debtor in failing circumstances, for such inadequacy of price that it is inequitable as against creditors for the purchaser to retain his bargain.

I am unable to come to the conclusion reached by the learned chancellor, that the circumstances of this transaction prove fraud in the parties to it, or in either of them. I do not discover in it anything suspicious, or regarding the situation of the persons contracting, strange or abnormal. It is true that the conveyance was made to a relative, but that relative was his creditor ; and,

besides, it was in execution of an understanding and purpose of the parties of ten years' standing. The reduction of the price of the farm and stock, as put in the deed by Charles, would, it is said, and perhaps truly, have been an unusual act between strangers. But the condition and relations in which persons dealing are found must be observed and considered in interpreting their acts and conduct. These parties were not strangers, but brethren. The younger was accustomed to defer to the judgment and wishes of the elder. To gain an advantage in dealing was no part of the purpose of either. If they did not bargain sharply and at arm's length, as strangers might, it is sufficient for the validity of their contracts that they dealt in honesty and fairness, and that the debtor did not donate away, in whole or in part, his property from his creditors. Mutual confidence in their commerce and intercourse was to be expected. It was their wont. Charles took upon himself to state the price in the deed. If that price had really been put too high, and the parties became persuaded of the fact, it was but natural for them, and an act of plain justice, to put it at the true value of the property sold. Fraud is out of long range of such an act. Equally natural and just was it that there should be made a settlement and allowance of the claim of William for his ten years of service on the farm under his brother's employment, if it be true that there existed such an agreement—and the proof of it I do not doubt. The correctness of the credit of the mortgage debt cannot be the subject of cavil. For the balance, William's bond and mortgage remains outstanding upon interest.

The testimony of William, that he assumed charge of the farm for the support of the family, on an agreement to be paid a compensation by Charles for the service, stands uncontradicted by any fact, circumstance or witness in the case. The service he performed with fidelity, and it does not appear that, beyond his mere living, there was a dollar of gain to him, other than the promised compensation, resulting, by their settlement, at less than the pay of a common laborer. That he allowed the promised reward to remain unpaid for ten years, unusual as it might be between ordinary master and servant, was, in view of the

ultimate purchase by William as arranged for, no startling novelty.

Nor am I able to perceive how a failure of these parties to make an inventory of the personal chattels conveyed with the farm, is an indication of fraud. The character and amount of the chattels were well known to each. The items were not numerous, and the whole was chiefly valuable in connection with the farm. An accurate estimate of the gross value would seem not to be at all difficult, and to persons not seeking to create appearances, such an inventory would be purposeless.

The complainant attacked, by his proof, the fairness and honesty of the reduction made in the price of the property conveyed. The attempt was to show that that price was so far beneath the true value as to evince a fraudulent motive of the parties to cover the debtor's property. Several witnesses competent to speak of the value of lands in the neighborhood, were put upon the stand by the complainant to prove the alleged inadequacy. It is entirely clear, I think, that the testimony, so far from impeaching the honesty of the agreed price, fully establishes it. The range of their estimates of the farm, increased by the proved value of·the personalty (a little less than $1,000), goes above and falls below the sum agreed upon—the average differs not essentially from it. The fair inference from this testimony is that the property conveyed could not, at the date of the deed or since, have been sold to another purchaser for that amount.

As a further badge of fraud, it is urged that if the conveyance was not made *pending the suit,* it was executed when suit was threatened by complainant. His claim had existed and been due for three years, and the only evidence that suit was threatened at the time, is found in the fact that suit was begun in Pennsylvania about three weeks after the conveyance was made, and in New Jersey two years later.

To impeach a conveyance on the ground that it was designed to hinder, delay or defraud creditors, it is necessary, not only that the vendor acts from such motive, but it is essential that the vendee shall concur in or have cognizance of the fraudulent purpose. *Merchants Bank* v. *Northrup, 7 C. E. Gr. 58 ; At-*

Muirheid *v.* Smith.

*wood* v. *Impson,* 5 *C. E. Gr. 151; Hildreth* v. *Lands, 14 Johns. Ch. 493; Magniac* v. *Thompson, 7 Pet. 347.* Now, whatever the design of Charles may have been in this transaction, to invalidate the deed on this ground, facts should have been established in proof to show or to justify the unequivocal inference that William participated in or had notice of such a design in accepting this grant. The learned judge who tried this cause conceived that there was such evidence in the case, hence the decree made by him; but on a careful examination of the evidence, I have been unable to find ground for a reasonable conjecture, even, that William participated in or was cognizant of any such unlawful purpose, if it existed. I see no reason whatever to doubt the truth of William's statement that he did not know that any debts were pressing Charles, or that he was indebted in any wise to the complainant, or that he was, before the filing of this bill, ignorant of the very existence of the complainant.

Astute as courts should be in the detection of fraud, they are not justified in finding it on grounds which show no more than its possible existence. When the acts of parties admit of a reasonable interpretation in favor of honesty and fair dealing, they should receive it.

I have failed to discover, in this case, any fact or circumstance which is not capable of a reasonable interpretation consistent with the entire good faith of William in this transaction. I think the consideration paid was legitimate and legal. William was the creditor of Charles, and they had a right to deal together in the adjustment of the debt, if the transactions were *bona fide,* and its good faith, so far, at least, as William is concerned, is, as I think, put beyond reasonable doubt.

But conceding the failure in the proof to establish actual fraud as against William, it is still contended that the conveyance ought not to stand, because the consideration for which it was made was so inadequate that it is, under the circumstances, inequitable that William should hold on to his bargain. In this court, in *Demarest* v. *Terhune, 3 C. E. Gr. 532,* a conveyance of lands by a debtor in failing circumstances to a creditor, in

payment of a debt due him, the amount of such debt appearing
to be an inadequate price, the conveyance was held to be volun-
tary as to such excess of value, therefore constructively fraudu-
lent against creditors, and was allowed to stand only as security
of the grantee's debt, a doubt existing as to the *bona fides* of the
transaction, the burthen of proving which was held to be upon
the creditor.   Inadequacy of consideration and doubt as to the
*bona fides* of the conveyance for other purposes than as security
of a debt, were the essential features of that case.   The princi-
ples ruling in it, if applied to this case, would result in a modi-
fication of the decree made below, which would charge upon the
lands the entire debt due from Charles to William, and not the
mortgage only.   But if the claim adjusted between William and
Charles, for services, be recognized as rightly allowed, the proof,
as I have already remarked, fails to show any inadequacy of
price, and it cannot be said that the conveyance was to any ex-
tent voluntary.   As to the sufficiency of the proof of that
claim, we have the promise to pay a compensation for the services
performed, and an adjustment between the parties of the value
of those services.   The nature and extent of the services are not
left in doubt; he became the servant of his brother to work his
farm, and out of it to provide for the support of his mother and
sister; he devoted the best years of his life to this duty.   The
parties agreed as to its value, and the complainant does not, by
any proof, attempt to deny the fact of its performance, or ques-
tion the fairness of the adjusted amount.

I am unwilling to disturb this conveyance for any reason
alleged against it.   I think the bill should have been dismissed,
and shall vote to reverse the decree, and order the bill dismissed.

The following opinion was delivered by

DEPUE, J.

The deed from Charles to William was executed on the 15th
of March, 1877, acknowledged March 19th, and recorded April
3d.

The price of the property conveyed was not agreed upon or
even discussed between the parties before the deed was executed

Muirheid v. Smith.

and delivered.   In June, three months after the deed was exe-
cuted, and two months after it was recorded, the parties got to-
gether for a settlement.   At this interview the price of the prop-
erty was reduced to $10,000, and William was allowed $2,000
for his services in managing the farm.   Those sums, to-
gether with $2,000, which represented William's interest in
the mortgage given by Charles to him and his sister, in 1866,
were credited on the $12,000 mortgage, leaving $6,000 the bal-
ance due on it.   The mortgage was subsequently assigned to
Margaret E. Rhodes.

I think it is clear that the conveyance was made by Charles
in pursuance of an understanding between the brothers, which
had existed for many years.   Charles had bought the homestead
in 1866, shortly after his father's death, in order to provide a
home for his mother and his sister Sarah, and an arrangement
was made that William should remain on the farm and culti-
vate and manage it, and should be permitted to become the
owner of it at some future time, when it suited the convenience
of all parties.

I think it also clear that there was a general understanding
that William was in some way to be compensated for his ser-
vices in remaining on the farm and managing it as a home for
the family.

In the absence of the claims of the creditors of Charles, the
conveyance to William, in March, 1877, was a thing eminently
fit and proper to be done.

I agree with the opinion of Judge Knapp, that the evidence
is not sufficient to sustain a decree setting aside the conveyance
entirely, as a conveyance made in fraud of creditors, for to set
aside and completely annul a deed made to a grantee, who is a
creditor, or who has given a consideration for the conveyance,
which shall carry with it a forfeiture of all the grantee's rights,
it is necessary that it should appear that the grantee had knowl-
edge of, or participated in the fraudulent intent of the grantor.
*Atwood* v. *Impson, 5 C. E. Gr. 151; Merchants National Bank*
v. *Northrup, 7 Id. 58 ; S. C., 8 Id. 582; Magniac* v. *Thomp-
son, 7 Pet. 348.*

But I do not agree to the relief proposed in the opinion read.

The circumstances connected with the execution and delivery of the deed, and the settlement of July, cast a cloud of suspicion over the transaction. While the evidence has relieved William from the imputation that he knowingly engaged in a scheme for the disposition of this property in fraud of the creditors of his brother, the fairness of the transaction, so far as concerns the conduct of Charles, in dealing with his property and with his creditors, is left in the greatest doubt.

The case made on the proofs is, I think, one for the application of the doctrine of courts of equity that, where a deed is sought to be set aside as voluntary and fraudulent as against creditors, and the evidence is not sufficient to induce the court to avoid the deed absolutely, on the ground of fraud, but is sufficient to raise up a well-grounded suspicion as to the adequacy of the consideration and the fairness of the transaction, the court will permit the conveyance to stand only as security for the consideration actually paid. *Boyd* v. *Dunlap, 1 Johns. Ch. 478; Demarest* v. *Terhune, 3 C. E. Gr. 532; Heintze* v. *Bentley, 7 Stew. Eq. 562.*

The deed from Charles to William, in addition to the homestead farm, included personal property described as "all the live stock, farming utensils and furniture, including all manner of personal property on the farm." The farm contained two hundred and seventeen acres, worth in 1877, according to the valuation put on it by witnesses, from $40 to $50 an acre. From the evidence, I think the farm was fairly worth, at the time of the conveyance of it, $10,000—the value put upon it by the parties themselves. The personal property William estimates at $1,200.

For the property conveyed William gave up his interest in the mortgage given to him and his sister in 1867, amounting to $2,000, and gave the bond and mortgage, on which $6,000 was due. The residue of the consideration fixed upon at the July interview was made up by an allowance of $2,000 to William for his services.

From the time Charles became the sole owner of the farm by

purchasing the interest of the other heirs in May, 1866, until March, 1877, the family lived on the farm, and its products were applied to the support of the family, and for the improvement of the farm. William had the sole management of the farming business. He employed the help, and marketed the products of the farm. He kept no account of sales or expenditures. No money was ever paid over to Charles. William says there was an agreement between him and his brother that he should be paid for his services, but no definite arrangement was made as to how he was to be paid, or on what terms he was to be employed. He managed the farm as if it were his own, supporting his mother and sister out of its products, without any accounting with his brother. No settlement was ever made, or accounting had with a view to a settlement, until the settlement of July, 1877.

In that settlement, $2,000 was allowed to William for his services without any investigation or any consideration as to how much his services were reasonably worth. · It was, as William said in his testimony, an allowance made to him in a lump.

Nor has any evidence been laid before the court to enable us to make any estimate of the value of William's services, or to state an account between William and Charles on that subject, or to determine whether $2,000 or any other sum would be reasonable compensation. We have nothing before us on which to adjudge that Charles was a debtor to William in the sum named, so that the debt might be regarded as a consideration actually advanced, except the fact that Charles admitted an indebtedness in that sum.

When a debtor in embarrassed circumstances makes a conveyance to one of his creditors for a consideration apparently inadequate, the burden is thrown upon him to show by full proof that the transaction was *bona fide;* and, as against other preexisting creditors, to sustain the conveyance the grantee must satisfy the court not only that he accepted the deed in good faith, but also that he gave adequate consideration for it. If adequate consideration be not made apparent, the court will allow the deed to stand only as security.

This was the course adopted by Chancellor Kent in *Boyd* v. *Dunlap*, and by this court in *Demarest* v. *Terhune* and in *Heintze* v. *Bentley*, and should be followed in this case.

I think the decree should be reversed, and that a decree should be made directing a reference to a master to ascertain how much was due William on his mortgage, and for his services, upon an accounting between the parties; and that the property, real and personal, should be sold, the land being sold subject to the $6,000 mortgage, and that out of the proceeds of sale there be paid the amount so found to be due to William, and that, after paying the costs of both parties, the residue be paid over to the complainant and the other creditors of Charles in the attachment suit.

*For reversal and dismissal of bill*—DIXON, KNAPP, REED, SCUDDER, GREEN, WHITAKER, PATERSON—7.

*For reversal and modification of decree*—DEPUE, MAGIE, PARKER, VAN SYCKEL, CLEMENT, COLE—6.